41 A.3d 618 (2012)
2012 PA Super 77
In the Interest of W.M., J.M., T.M., M.M., M.M., Minor Children.
Appeal of Washington County Children & Youth Social Service Agency.
No. 751 WDA 2011.
Superior Court of Pennsylvania.
Argued October 25, 2011.
Filed March 29, 2012.
*619 Joyce A. Hatfield-Wise, Washington, for appellant.
Frank C. Kocevar, Monongahela, for appellees.
Eric R. Isenhart, Washington for W.M., participating party.
BEFORE: MUSMANNO, ALLEN and MUNDY, JJ.
OPINION BY MUSMANNO, J.:
Washington County Children and Youth Social Service Agency ("CYS" or "Agency") appeals from the Order finding that *620 CYS was not eligible for federal funding for its foster care maintenance program because it did not use reasonable efforts to prevent placement of five minor children: fourteen-year-old male, W.M.; ten-year-old female, J.M.; six-year-old male, T.M.; four-year-old female M.M.; and three-year-old female, M.M. (collectively "the Children") until January 14, 2011, the time that the trial court entered an Emergency Shelter Order.[1] We affirm the trial court's decision that CYS was ineligible for federal funding for its foster care maintenance program prior to January 14, 2011, albeit on different grounds than set forth by the trial court.
The trial court set forth the factual background and procedural history of this appeal as follows:
On January 27, 2011, the Washington County Juvenile Master, Dennis R. Paluso, Esquire, conducted a shelter hearing on this matter. The Guardian Ad Litem for the [C]hildren and attorneys for the Agency and for the [C]hildren's Father appeared at the hearing. Testimony offered at the hearing revealed that on December 17, 2010, the [C]hildren were removed from Father's care pursuant to a Voluntary Placement Agreement due to deplorable housing conditions. Upon inspection, the caseworker discovered that the basement of the house was flooded, that the [C]hildren were without clean clothes and that there was minimal food in the home. All of the [C]hildren's clothes looked to have mold and mildew on them. The [C]hildren were disheveled [and] wearing clothes that did not fit them. The soles of their shoes were falling off. The three[-]year[-]old and four[-]year[-]old girls were potty trained and had no underwear and no socks. In addition, the caseworker found dog feces throughout the home, including in the [C]hildren's bedrooms and the kitchen, and two dead puppies on the porch. In addition, the family had an extensive history with Greene County's Children and Youth Services Agency for the same issues, [i.e.,] deplorable housing and lack of supervision. After inspecting the conditions of the home and the [C]hildren, the caseworker then contacted Father and offered him a Voluntary Placement Agreement, and stated that if he did not cooperate, the other option would be the Agency seeking an Emergency Order. Consequently, Father agreed to sign the Voluntary Placement Agreement. Accordingly, three of the five children were placed in Agency foster care and the remaining two children were placed in relative placement with the paternal grandfather. By its terms, the Voluntary Placement Agreement would be effective for thirty days, and required [Father] to "clean up the house." No family services were offered nor was a care plan provided.
The Agency had no further contact with the family until January 13, 2011, when the caseworker was scheduled to inspect Father's home. On January 13, 2011, the caseworker attempted to conduct the inspection but Father was unavailable as he was called to work. The caseworker spoke to Father[,] who claimed that the home would be suitable *621 for the [C]hildren to return. However, the caseworker testified that based on the family's history, "It just seems like they're unable to maintain the housing."... [B]ecause the caseworker did not inspect the home between the time of removal and the expiration of the [v]oluntary [p]lacement [a]greement, and because the caseworker was not convinced that the family could maintain the home, the Agency sought and obtained an Emergency Shelter Order on January 14, 2011.
A Shelter Hearing was held on January 27, 2011, before Master Paluso. At the conclusion of the testimony, the Master found that there were sufficient facts to support shelter care placement for the five children as the [C]hildren were without clean clothing, there was not adequate food in the house and that there were dog feces throughout the home, including in the kitchen and in the [C]hildren's bedrooms. In addition, the Master found that there was still water in the basement, that there were two dead puppies on the back porch and that another female dog was emaciated, requiring the Agency to contact the local Humane Society. The Master also found that the Agency did not offer Father any services nor was a case plan prepared pursuant to the [v]oluntary [p]lacement [a]greement, which was found to be standard Agency practice. Additionally, the Master found that after the [v]oluntary [p]lacement [a]greement was signed, the Agency's only contact with the family was on January 13, 2010, when the caseworker spoke to [F]ather via telephone, after she learned that Father was unavailable for the scheduled inspection of the home because Father had been called into work. Finally, Master Paluso found that it was contrary to the best interests and welfare of the [C]hildren to be returned home and that they were safe in their current placements. At the conclusion of the Shelter Hearing, the Master deferred the determination of whether the Agency used reasonable efforts to prevent placement outside the home and whether or not exigent circumstances existed until the adjudicatory hearing.
On March 22, 2011, the Juvenile Master conducted the adjudicatory hearing and a hearing on reasonable efforts. At this hearing, Joyce Hatfield-Wise, attorney for the Agency, John Richards, Guardian Ad Litem for the [C]hildren, Eric Isenhart, attorney for ... Father, Jessica Roberts, attorney for [H.H.], the mother of [T.M., M.M.], and [M.M.], and Keith Emerick[,] attorney for [D.M.], the mother of [W.M.] and [J.M.], were present with their respective clients. During this hearing, counsel for the Agency argued that due to the fact that the Voluntary Placement Agreement was about to expire on January 16, 2011, this fact alone constituted exigent circumstances and that an Emergency Shelter Order was necessary to protect the [C]hildren. In response, counsel for Father argued that the Agency failed to offer adequate services or any services to Father prior to seeking the Emergency Shelter Order on January 14, 2011, and that the expiration of the Voluntary Placement Agreement did not, in and of itself, constitute exigent circumstances. Following argument, the Master issued a Recommendation and found that under the circumstances of this case, taking into consideration the family history of deplorable conditions in [Washington] County and Greene County and the dangerous condition of the home, that [sic] the Agency did not use reasonable efforts to prevent placement of the [C]hildren outside the family home up until January 14, 2011, at the time [the trial *622 court] entered an Emergency Shelter Order, but used reasonable efforts after that date.
In addition, the Master found that the parties had agreed that the [C]hildren shall be placed under the care, custody and supervision of [CYS]. The Master also found that two of the [C]hildren should be placed in relative care placement with [the] paternal grandfather and that the remaining three children be placed in foster care placement. Finally, the Master recommended that Father participate in homemaker services as recommended by the Agency and that a hearing be scheduled within 90 days.
Trial Court Opinion, 6/16/11, at 1-5 (footnotes omitted).
After reviewing the record and the Master's recommendation, the trial court approved and adopted the Master's Recommendation in an Order dated March 31, 2011, and entered on April 8, 2011.
On May 6, 2011, CYS filed a timely Notice of appeal and a Pennsylvania Rule of Appellate Procedure 1925(b) Concise Statement. On appeal, CYS raises the following questions for our review:
1. Whether the trial court abused its discretion or erred as a matter of law when it misapplied or improperly considered regulatory provisions concerning voluntary placement agreements and family service plans with the standard to be considered upon the emergency removal of children[?]
2. Whether the trial court abused its discretion or erred as a matter of law when it failed to find that exigent circumstances existed, including the father's own actions of cancelling a scheduled home visit and the weekend expiration of the voluntary placement agreement, which prevented the agency from being able to ensure the safety of the minor children and under the totality of the circumstances necessitated the request and entry of an Emergency Shelter Order[?]
3. Whether the trial court abused its discretion or erred as a matter of law when it failed to recognize the voluntary placement agreement and the provision of Agency casework services as a meaningful, legitimate, and reasonable effort to prevent or eliminate the need for placement[?]
CYS Brief at 4.
Our standard of review in dependency cases is as follows:
[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.
In re J.P., 998 A.2d 984, 987 (Pa.Super.2010) (citation omitted); see also In re R.J.T., 608 Pa. 9, 9 A.3d 1179, 1190 (2010). "Additionally, the master's report and recommendation, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, *623 because the master has the opportunity to observe and assess the behavior and demeanor of the parties." Taper v. Taper, 939 A.2d 969, 973-74 (Pa.Super.2007); see also Mintz v. Mintz, 258 Pa.Super. 187, 392 A.2d 747, 749 (1978).
We will address CYS's first and third claims together as both concern voluntary placement agreements. In its first claim, CYS contends that the trial court misapplied or improperly considered regulatory provisions concerning voluntary placement agreements and family service plans, such that CYS's eligibility for federal funding for its foster care program was impacted. CYS Brief at 10. CYS argues that CYS's eligibility for the federal foster care maintenance payment program is conditioned upon the State's adherence to the requirements set forth at section 672 of the federal Adoption Assistance and Child Welfare Act of 1980 ("AACWA").[2] CYS Brief at 10-11. CYS asserts that because the Children in the present matter were initially placed in its care under a voluntary placement agreement entered into by Father, there was no need for a judicial determination of reasonable efforts to preserve the family on the part of CYS under the statute. Id. CYS points out that there is a dearth of both federal and state case law on the subject of voluntary placement and voluntary placement agreements, as set forth in section 672, and seeks this Court's guidance on the matter. Id. at 11.
CYS also contends that the Master erroneously found that CYS had to prepare a case plan for the Children, which would have included the treatment goals to be achieved for reunification to occur, the services to be provided, and the terms of visitation. Id. at 11-12. CYS argues that the Master's reliance on Section 5.2.1 of the PENNSYLVANIA DEPENDENCY BENCHBOOK[3] was misplaced as that section was inaccurate and misinterpreted the Pennsylvania Administrative Code. Id. at 12. CYS specifically asserts that Section 5.2.1 of the Benchbook cited to 55 Pa.Code. § 3130.65, which governs the requirements of a voluntary placement agreement in Pennsylvania, but does not set forth any requirements regarding case plans. CYS Brief at 12. CYS claims that it was not required to make a case plan under the circumstances. Id. at 13.
In its third claim, CYS contends that its actions in entering into the voluntary placement agreement with Father and providing CYS casework services amounted to a meaningful, legitimate, and reasonable effort to prevent or eliminate the need for placement of the Children. Id. at 15-17. CYS argues that it had no reason to believe that Father was in need of any additional services in order to clean his home. Id. at 16-17.
It has been the national, State and local policy for many years pursuant to the [AACWA] to remove children from foster placement limbo where they know neither a committed parent nor can look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family. The [AACWA] provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the [AACWA's] *624 requirements. States such as Pennsylvania, which participate in the program, are required to make reasonable efforts to return the child to [his or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in [ASFA] (Public Law 105-89, 111, stat. 2119). Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, [and] placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.
In re B.L.L., 787 A.2d 1007, 1016 (Pa.Super.2001) (footnote omitted); In Interest of S.A.D., 382 Pa.Super. 166, 555 A.2d 123, 124 (1989) (stating that "[i]n our Commonwealth, the services required by the federal act are implemented through the Department of Public Welfare and the County Children and Youth Services."); see also 42 U.S.C.A. § 670. Our General Assembly amended the Juvenile Act, 42 Pa.C.S.A. § 6301 et seq., to reflect the stated policy of ASFA to preserve the unity of the family whenever possible or to provide another permanent family when the unity of the family cannot be achieved. In re G.P.-R., 851 A.2d 967, 975 (Pa.Super.2004).
Relevant to this appeal, sections 671 and 672 of ASFA provide the following, in pertinent part:
§ 671. State Plan for Foster Care and Adoption Assistance
(a) Requisite features of a State plan
In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which
* * *
(15) provides that
(A) in determining reasonable efforts with respect to a child, as described in this paragraph, and in making such reasonable efforts, the child's health and safety shall be the paramount concern;
(B) except as provided in subparagraph (D) reasonable efforts shall be made to preserve and reunify families
(i) prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and
(ii) to make it possible for a child to safely return to the child's home[.]
42 U.S.C.A. § 671; see also 45 C.F.R. § 1356.21(b) (regulations stating the agency's requirements to make reasonable efforts to maintain family units).
§ 672. Foster Care Maintenance Payments Program.
(a) In general
(1) Eligibility
Each State with a plan approved under this part shall make foster care maintenance payments on behalf of each child who has been removed from the home of a relative specified in section 606(a) of this title (as in effect on July 16, 1996) into foster care if
(A) the removal and foster care placement met, and the placement *625 continues to meet, the requirements of paragraph (2); and
(B) the child, while in the home, would have met AFDC [Aid to Families with Dependent Children] eligibility requirements of paragraph (3).
(2) Removal and foster care placement requirements.
The removal and foster care placement of a child meet the requirements of this paragraph if
(A) the removal and foster care placement are in accordance with
(i) a voluntary placement agreement entered into by a parent or legal guardian who is the relative referred to in paragraph (1); or
(ii) a judicial determination to the effect that continuation in the home from which removed would be contrary to the welfare of the child and that reasonable efforts of the type described in [42 U.S.C.A. § 671(a)(15)] for a child have been made[.]
* * *
(f) "Voluntary placement" and "voluntary placement agreement" defined
For the purposes of this part [part E Federal Payments for Foster Care and Adoption Assistance] and part B of this subchapter, (1) the term "voluntary placement" means an out-of-home placement of a minor, by or with participation of a State agency, after the parents or guardians of the minor have requested the assistance of the agency and signed a voluntary placement agreement; and (2) the term "voluntary placement agreement" means a written agreement, binding on the parties to the agreement, between the State agency, any other agency acting on its behalf, and the parents or guardians of a minor child which specifies, at a minimum, the legal status of the child and the rights and obligations of the parents or guardians, the child, and the agency while the child is in placement.
42 U.S.C.A. § 672.
The Federal Regulations set forth the requirements regarding payments from the federal authorities for voluntarily placed children as follows:
§ 1356.22 Implementation requirements for children voluntarily placed in foster care.
(a) As a condition of receipt of Federal financial participation (FFP) in foster care maintenance payments for a dependent child removed from his home under a voluntary placement agreement, the title IV-E agency must meet the requirements of:
(1) Section 472 of the Act, as amended [see 42 U.S.C.A. § 672];
(2) Sections 422(b)(8) [see 42 U.S.C.A. § 622(b)(8) (setting forth the requisite features of the state plan)] and 475(5) [see 42 U.S.C.A. § 675(5) (defining the term "case review system")] of the Act;
(1) 45 CFR 1356.21(e) [Trial home visits], (f) [Case review system], (g) [Case plan requirements], (h) [Application of the permanency hearing requirements], and (i) [Application of the requirements for filing a petition to terminate parental rights at section 475(5)(E) of the Social Security Act]; and
(4) The requirements of this section.
45 C.F.R. § 1356.22(a).
Further, section 3130.65 of the Pennsylvania Department of Public Welfare Regulations sets forth the requirements of a voluntary placement agreement in Pennsylvania as follows:

*626 § 3130.65. Voluntary placement agreement.
(a) Custody of a child may be temporarily transferred to the county agency for no more than 30 days if the child's parents or other person legally responsible for the child freely enter into a written agreement with the county agency. The agreement may not be renewed beyond the 30 days and shall contain:
(1) A statement of the parents' or legal guardian's right to be represented by legal counsel or other spokesperson during conferences with the county agency about voluntary placement.
(2) A statement of the parent's or legal guardian's right to refuse to place the child.
(3) A statement of the parents' or legal guardian's right to visit the child, to obtain information about the child, and to be consulted about and approve medical and educational decisions concerning the child while the child is in voluntary placement.
(4) A statement of the parents' or legal guardian's right to the immediate return of the child upon request of the parent or guardian, unless the court orders the legal custody of the child to be transferred to the county agency.
(b) Placement of a child may not extend beyond 30 days unless a court order has been entered under 42 Pa.C.S. §§ 6341 and 6351 (relating to adjudication; and disposition of dependent child) which authorizes continued placement.
55 Pa.Code § 3130.65.
Here, the plain language[4] of section 672 states that in order for a child to qualify for foster care maintenance payments, the removal from the home and placement in foster care must occur by either of two ways: a voluntary placement agreement by a parent or legal guardian or a judicial determination that a child's continued presence in the home would be contrary to his/her welfare. See 42 U.S.C.A. § 672(a)(2)(A). The statute also provides that in those instances where a judicial determination has been made regarding the removal and foster care placement of a child, the agency must also obtain a judicial determination that it made reasonable efforts, as described in section 671(a)(15), to prevent removal.[5]See In Interest of S.A.D., 555 A.2d at 127 (stating that there must be a judicial determination that reasonable efforts were made to prevent removal and keep the family intact in order for the state to be eligible for federal funds where the removal of the child from the home was the result of a judicial determination); see also 42 Pa.C.S.A. § 6351(b)(2) (stating that prior to entering an order of disposition that would remove a dependent child from his/ her home, the court must enter findings on the record to determine "whether reasonable efforts were made prior to the placement *627 of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition[.]").[6] However, where the removal of a child has been made pursuant to a voluntary placement agreement, the statute is silent as to the need for a judicial determination regarding the agency's reasonable efforts prior to placement. "[I]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another[.]" BFP v. Resolution Trust Corp., 511 U.S. 531, 537, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) (citation omitted). Thus, based upon the ordinary meaning of the statutory language, an agency is not required to obtain a judicial determination that it made reasonable efforts of the type described in 42 U.S.C.A. § 671(a)(15), where the removal of a child is made pursuant to a valid voluntary placement agreement.[7]
Thus, we first must determine whether CYS has demonstrated that it fulfilled the requirements of a voluntary placement agreement. It is clear from *628 section 672(f) that a voluntary placement recognizes an out-of-home placement of a minor child where "the parents or guardians of the minor have requested the assistance of the agency." 42 U.S.C.A. § 672(f) (emphasis added). Here, Heather Lawson ("Lawson"), a caseworker with CYS, testified that on December 17, 2010, she and her supervisor responded to a report regarding the deplorable conditions at Father's home. N.T., 1/27/11, at 6. Lawson stated that she called Father on the phone and offered him a voluntary placement agreement to place the Children in CYS's custody. Id. at 7. Lawson testified that she told Father that if he did not want to sign such an agreement, CYS would obtain an emergency order for the Children. Id. Lawson indicated that Father subsequently signed the voluntary placement agreement. Id. at 7-8. The uncontroverted evidence presented at trial demonstrates that Father did not request any assistance from CYS, as required for a voluntary placement. Instead, CYS asked Father to sign the voluntary placement agreement with the understanding that had he not done so, CYS would seek an emergency order for the Children. Based on this evidence, CYS failed to meet the requirements set forth in section 672(f) regarding voluntary placement.
Moreover, CYS has failed to include the actual agreement in the certified record.[8]See Brandon v. Ryder Truck Rental, Inc., 34 A.3d 104, 106 n. 1 (Pa.Super.2011) (stating that the ultimate responsibility of providing a complete record to an appellate court rests squarely upon the appellant); see also In Interest of S.A.D., 555 A.2d at 125 (stating court will not consider voluntary placement agreement where agency failed to provide the agreement). Indeed, there is no evidence in the record that the alleged voluntary placement agreement included a statement of Father's right to be represented by legal counsel; a statement of Father's right to refuse to place the Children; a statement that Father had a right to visit the Children, obtain information about the Children, and approve educational and medical decisions concerning the Children; and a statement that Father had a right to request the immediate return of the Children. See 55 Pa.Code § 3130.65. Thus, the evidence of record does not support a finding that Father signed a valid voluntary placement agreement.[9] Accordingly, because Father did not seek CYS's assistance and we cannot confirm that CYS offered and that Father signed a valid voluntary placement agreement, we conclude that CYS did not fulfill the requirements of section 672(a)(2)(A)(i) and is not entitled to federal funding under the foster care maintenance program. See 45 CFR § 1356.22 (stating that the state agency must fulfill all of the requirements *629 listed in the regulation to obtain funding). Further, based upon this conclusion, we need not address CYS's claims regarding the preparation of case plans following the entry of a valid voluntary placement agreement.[10]
In its second claim, CYS contends that the trial court abused its discretion in failing to find that exigent circumstances existed and necessitated the entry of the Emergency Shelter Order. CYS Brief at 13-14. CYS argues that Father's cancellation of a scheduled home visit and his failure to seek a review of his housing conditions and the expiration of the voluntary placement agreement required it to provide for the Children's safety by obtaining the Emergency Shelter Order. Id. at 14. CYS also asserts that the trial court erroneously found that it had no contact with Father between December 17, 2010, the day the alleged agreement was signed, and January 13, 2011, the day that Father cancelled the home visit. Id. at 14-15.
Contrary to CYS's claim, the trial court granted the relief sought by CYS, i.e., the entry of an Emergency Shelter Order on January 14, 2011. Thus, because CYS was afforded the relief it sought, there is no controversy and CYS cannot maintain this claim on appeal. See Pa.R.A.P. 501 (stating that only a party who has been aggrieved by a ruling may appeal that determination); see also In re J.G. 984 A.2d 541, 546 (Pa.Super.2009) (en banc) (stating that "[a] prevailing party is not `aggrieved' and therefore, does not have standing to appeal an order that has been entered in his or her favor.") (citation omitted). Moreover, as to CYS's claims regarding its contacts with Father between December 17, 2010, and January 13, 2011, we need not address these claims because CYS failed to demonstrate that it fulfilled the requirements of a valid voluntary placement agreement.
Additionally, CYS has raised claims regarding its efforts following the entry of the Emergency Shelter Order on January 14, 2011. See CYS Brief at 12-13. CYS argues that the trial court erred in finding that CYS did not make reasonable efforts to eliminate the placement of the Children due to the lack of a case plan thirteen days after the entry of the Emergency Shelter Order. Id. CYS has not raised any issues related to this portion of the trial court's Order in its Rule 1925(b) Concise Statement. See Love v. Love, 33 A.3d 1268, 1273 (Pa.Super.2011) (stating that issues not raised in a concise statement are waived on appeal). Furthermore, contrary to CYS's argument, the trial court specifically found that CYS had provided reasonable efforts after entry of the Emergency Shelter Order. See Order, 4/18/11 (stating that CYS used reasonable efforts after the entry of the emergency order).[11] Thus, because CYS has prevailed on this issue, it also cannot maintain the issue on appeal. See In re J.G., 984 A.2d at 548.
Based upon the foregoing, CYS is not *630 entitled to relief.[12]
Order affirmed.
NOTES
[1] The trial court also adopted the Juvenile Hearing Master's findings and recommendations, and adjudicated the Children dependent under section 6302 of the Juvenile Act, 42 Pa.C.S.A. § 6301 et seq. The trial court found that two of the Children should be placed in relative care placement with paternal grandfather and that the remaining three children be placed in foster care placement; that the Children's father ("Father") participate in homemaker services as recommended by CYS; and that a hearing be scheduled within 90 days.
[2] We note that the Adoption and Safe Families Act of 1997 ("ASFA") amended AACWA. See 42 U.S.C.A. § 670 et seq. ASFA maintained the basic formula of AACWA and reaffirmed the federal government's commitment to preserving families; however, ASFA placed an emphasis on the health and welfare of the child.
[3] See Pennsylvania Children's Roundtable Initiative. PENNSYLVANIA DEPENDENCY BENCHBOOK. Harrisburg, PA: Office of Children and Families in the Courts, 2010.
[4] See Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, ___, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009) (stating that "[s]tatutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.") (citation omitted); see also McGrory v. Dep't of Transp., 591 Pa. 56, 915 A.2d 1155, 1158 (2007) (stating that a statute's plain language generally provides the best indication of legislative intent).
[5] The United States Department of Health and Human Services has issued a Child Welfare Policy Manual which sets forth the relevant existing policy issuances under the Foster Care Maintenance Payments Program. Under section 672(a)(2)(A), the Manual states that there must be a judicial determination with regards to an agency's reasonable efforts where the child's removal from the home was based on a judicial determination. See Child Welfare Policy Manual, Section 8.3A.9, Question 1 (effective 9/24/01).
[6] The Juvenile Act also states that in cases where preventive services were not offered due to an emergency placement, the court must enter findings on the record that demonstrate whether the "lack of services was reasonable under the circumstances." 42 Pa. C.S.A. § 6351(b)(3); see also id. § 6332(a) (stating that in the case of an emergency placement where services were not offered and could not have prevented the necessity of placement, the court must determine "whether this level of effort was reasonable due to the emergency nature of the situation, safety considerations and circumstances of the family.").
[7] We note that as a condition to receiving foster care maintenance payments, Congress requires States to include in their Title IV-E state plans, a commitment demonstrating the agency's efforts to prevent placement and reunify all children, including those voluntarily placed by the parent, with their family. See 42 U.S.C.A. § 622(b)(8) (providing that the State plan include a service program that will return children to the families from which they have been removed); 45 C.F.R. § 1356.21(g)(4) (stating that the State case plan must "[i]nclude a description of the services offered and provided to prevent removal of the child from the home and to reunify the family[.]"); see also Child Welfare Policy Manual, Section 8.3A.9a, Question 3 (stating that while a judicial determination regarding reasonable efforts is not required to finalize a permanency plan for a child placed in foster care as a result of a voluntary placement agreement, "the State must comply with the State plan requirements to provide reasonable efforts for all children as described in section 471(a)(15) of the Act, including those children who are voluntarily placed."). Furthermore, while the PENNSYLVANIA DEPENDENCY BENCHBOOK cites an incorrect section of the Pennsylvania Code regarding case plans, the book's conclusion that the agency should prepare a case plan following a child's placement pursuant to a voluntary placement agreement is supported by the Code. See PENNSYLVANIA DEPENDENCY BENCHBOOK, at 41, Section 5.2.1; In Interest of S.A.D., 555 A.2d at 127 (stating that "Congress also required that a state must establish preventive and reunification services for all children in foster care, including those voluntarily placed by a parent[.]"). Indeed, under 55 Pa.Code § 3130.61, the county children and youth services agency must prepare a written service plan for children receiving services from the agency within sixty days of accepting the children. 55 Pa.Code § 3130.61. Importantly, section 3130.61 makes no distinction between children that are placed with a county agency through a voluntary placement agreement or through a judicial determination. The initial plan must include, inter alia, the service objectives of the family, identifying changes to prevent placement of the children, the services provided, and the ultimate goals for the children. See 55 Pa.Code § 3130.61; see also 55 Pa.Code § 3130.67; In re Interest of M.B., 388 Pa.Super. 381, 565 A.2d 804, 806-07 (1989). Ostensibly, the agency must provide timely services following removal and placement to meet its goals to reunite the family. See Trial Court Opinion, 6/16/11, at 12 (stating that "reasonable efforts must be made after placement to reunite the family.").
[8] The testimony presented at the hearings indicates that Father did sign some type of agreement. N.T., 3/22/11, at 5, 24, 25, 28; N.T., 1/27/11, at 8, 42. However, as the agreement was not included in the certified record, we are unable to confirm its contents.
[9] We note that it is unclear whether Father's decision to sign a voluntary placement agreement was in fact voluntary due to CYS's statements that it would seek an emergency order had Father not signed the agreement. See Smith v. Org. of Foster Families for Equal. & Reform, 431 U.S. 816, 834, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977) (dictum) (stating that "many `voluntary' placements are in fact coerced by threat of neglect proceedings and are not in fact voluntary in the sense of the product of an informed consent.") (footnote omitted); see generally In re N.B., 817 A.2d 530, 532 (Pa.Super.2003) (stating that Philadelphia Department of Human Services sought commitment of child with the trial court after the child's parents refused to sign a voluntary placement agreement). However, because this issue is not currently before this Court, we will not address it.
[10] At the hearings, CYS argued that even if it had to prepare a family service plan, it had sixty days after the placement of the Children to prepare the plan, which exceeds the length of the voluntary placement agreement. N.T., 3/22/11, at 8; N.T., 1/27/11, at 37-38. While the trial court addressed this claim in its Opinion, see Trial Court Opinion, 6/16/11, at 9-10, CYS did not raise this specific claim on appeal. Thus, we need not address the claim.
[11] Ostensibly, the trial court found that CYS is eligible for federal funds regarding the care of the Children after January 14, 2011. While it is unclear whether CYS may continue to collect funds if the initial voluntary placement agreement is invalid, we need not address this issue as it is not properly before this Court.
[12] We note that we may affirm the trial court's Order on a different basis from the trial court's reasoning. See Jones v. Nationwide Prop. and Cas. Ins. Co., 995 A.2d 1233, 1237 (Pa.Super.2010) (stating that this Court may affirm on an alternative basis from the trial court).