J-S23030-19

2019 PA Super 248

| | | |
|---|---|---|
| IN THE INTEREST OF: D.M.D.-C. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| APPEAL OF: ALLEGHENY COUNTY OFFICE OF CHILDREN YOUTH AND FAMILIES | : | |
| | : | No. 1773 WDA 2018 |

Appeal from the Order Entered November 14, 2018
In the Court of Common Pleas of Allegheny County Family Court at
No(s): CP-02-DP-0001056-2015

BEFORE: BENDER, P.J.E., NICHOLS, J., and COLINS, J.[*]

OPINION BY NICHOLS, J.: FILED AUGUST 19, 2019

Appellant Allegheny County Office of Children, Youth, and Families (CYF) appeals from the order granting the motion filed by D.M.D.-C. (Child), born in November 2006, to have foster care payments paid to M.K., Child's biological father whose parental rights were previously terminated when Child was an infant. CYF argues that the trial court abused its discretion by ordering that M.K. receive foster care payments. We affirm.

The factual and procedural background are undisputed.

On June 5, 2015, J.C., [the adoptive father of Child], filed a private dependency petition pursuant to 42 Pa.C.S.[] § 6334 alleging that Child had committed specific acts of habitual disobedience. The alleged acts of disobedience by Child included lying, manipulative conduct, threats, verbal aggression, sexual displays, and lack of remorse for his actions. [J.C.] alleged in the petition fear for his own safety and the safety of Child. [The trial court] appointed a guardian ad litem, and on August 24, 201[5], entered an order for emergency protective custody . . . .

———————————————

[*] Retired Senior Judge assigned to the Superior Court.

Following an August 26, 2015 shelter care hearing pursuant to 42 Pa.C.S.[] § 6332, [the trial court] found [J.C.] unable to care for Child due to [J.C.] suffering a serious medical condition. Concluding that returning [Child] to the home [of J.C.] was not in [Child's] best interests and that to allow Child to remain in [J.C.'s] home would be contrary to [Child's] welfare, [the trial court] transferred legal custody of Child to [CYF], and physical custody of Child to a foster parent. The order referred the foster parent for foster care certification and directed that she be provided with emergency caregiver funds.

On December 2, 2015, [the trial court] adjudicated Child dependent pursuant to 42 Pa.C.S.[] § 6302. Following a permanency review hearing on March 14, 2016, [the trial court] ordered Child to remain in the kinship foster home of his foster mother, S.C.

Following a subsequent permanency review hearing on April 18, 2016, [the trial court] noted that Child had suffered behavioral problems while in the care of [J.C.], and that [J.C.] had made minimal progress toward alleviating the circumstances that led to Child's removal. The order additionally transferred physical custody of Child to D.A., a new kinship foster care provider.

Following a subsequent permanency [review] hearing . . . on July 25, 2016, [the trial court] found that [J.C.] had made little progress toward reunification, largely due to medical issues, and ordered that Child remain in the kinship foster home of D.A. These findings and dispositions remained unchanged over the course of subsequent permanency hearings on October 31, 2016, February 6, 2017, May 1, 2017, and July 31, 2017.

On October 23, 2017, [the trial court] conducted a permanency review hearing at which time physical custody of Child [was] transferred to G.D., a new kinship foster caregiver.

Following a permanency review hearing on January 22, 2018, [the trial court] permitted Child to have unsupervised day visits with his biological father, M.K., whose parental rights to Child had been terminated when Child was still an infant. [CYF] filed a motion for consideration of M.K.'s criminal record on February 15, 2018, given the grant of unsupervised visitation. On March 1, 2018, [the trial court] granted [CYF's] motion and after consideration of

- 2 -

[M.K.'s] criminal record, permitted a continuation of the unsupervised visits.

Following a permanency review hearing on April 16, 2018, [the trial court] directed that physical custody of Child remain with kinship foster parent G.D., and that the permanency goal of placing [C]hild with a relative as a legal custodian remain unchanged. [The trial court] additionally permitted continued unsupervised day visits between Child and [M.K.], and additionally ordered [CYF] to assess [M.K.] as a possible placement resource.

At a subsequent permanency review hearing on July 9, 2018, after determining that Child had expressed a desire to live with [M.K.], while physical custody remained with kinship foster parent G.D., [the trial court] continued to permit visits between Child and [M.K.], and ordered [CYF] to schedule an interactional evaluation with [M.K.]. On August 20, 2018, [the trial court] transferred physical custody of Child to biological father M.K., concluding that such disposition was better suited to the protection and physical, mental and moral welfare of Child.

On October 19, 2018, the guardian ad litem for Child filed a motion for foster care funds requesting that [the trial court] order [CYF] to make a referral to an appropriate foster care agency or issue unapproved foster care payments to [M.K.] Specifically, the guardian ad litem alleged that . . . M.K. had not received any form of foster care payments since Child's placement with him on August 20, 2018. The guardian ad litem asserted in the motion that it was her understanding that [CYF] was opposed to referring . . . M.K. for foster care certification which would allow him to become a certified foster parent, that Child wished to remain in the care of biological father, and that biological father required financial assistance to continue to care for [C]hild. The guardian ad litem further contended that it was in Child's best interests to remain with [M.K.] and for [M.K.] to become a certified foster parent or receive unapproved foster care payments retroactive to August 20, 2018.

Trial Ct. Op., 1/24/19, at 3-6 (some capitalization omitted). The docket and

record do not indicate that CYF filed a response or memorandum of law to the

guardian ad litem's motion. On November 14, 2018, the trial court held a hearing on the guardian ad litem's motion and granted it.

On November 21, 2018, CYF filed a motion for reconsideration and supporting memorandum of law.[1] In the reconsideration motion, CYF alleges that on November 14, 2018, it "presented" to the trial court a memorandum of law in opposition to the guardian ad litem's motion. CYF's Mot. for Recons., 11/21/18, at ¶ 5. CYF's memorandum of law asserted that M.K., whose parental rights to Child were previously terminated, cannot collect foster care payments for Child. CYF's Mem. of Law Opposing the Payment of Unapproved Foster Care, 11/21/18, at 1 (unpaginated).

CYF filed a timely notice of appeal and a Pa.R.A.P. 1925(b) statement on December 12, 2018. The trial court subsequently denied CYF's motion for reconsideration on December 13, 2018.

CYF raises the following issue:

_____

[1] CYF filed two duplicative motions for reconsideration on November 21, 2018, at 10:46 a.m. CYF's supporting memorandum of law was filed at 10:51 a.m., also on November 21, 2018. We note this because the certificate of service for the memorandum of law states that it was served on the other parties on November 13, 2018, or one day before the November 14, 2018 hearing. As noted above, the docket and record do not reflect any such filing on November 13th or 14th, and CYF's own motion for reconsideration asserts that a memorandum of law was "presented" to the trial court on November 14, 2018. Because the trial court did not find CYF waived its arguments by presenting them for the first time in a motion for reconsideration, we presume that the trial court considered CYF's memorandum of law at the November 14, 2018 hearing.

Whether the trial court abused its discretion and/or erred as a matter of law by ordering unapproved foster care payments when there was no showing that biological father, whose parental rights had been previously terminated, was in financial need of such assistance and/or could qualify for such assistance through federal or state funding?

CYF's Brief at 4.[2]

In support of its claim, CYF raises three arguments. First, CYF initially acknowledges that M.K. is Child's biological father. Id. at 10. CYF argues that because the trial court had terminated M.K.'s parental rights shortly after Child's birth, M.K. "does not meet the definition of a foster parent" for the purpose of receiving foster care payments. Id. In support, CYF cites to the Pennsylvania Code,[3] but concedes the trial court is not bound by it. Id. CYF maintains, however, that "to pay foster care payments to a biological parent would be fiscally irresponsible and in direct contravention of public policy as well as the law."[4] Id.

_____

[2] Child's adoptive father, J.C., and the guardian ad litem for Child filed appellate briefs in support of payments, but M.K. did not.

[3] CYF cites to 55 Pa. Code § 3700.5, which sets forth the requirements for waiving a provision of Chapter 3700, which lists regulations governing foster parents. CYF's Brief at 10. CYF emphasizes that 55 Pa. Code § 3700.5(b)(4) states that any waiver must "not violate or condone noncompliance with Federal statutes and regulations or State statutes and regulations other than the requirement of this chapter for which the waiver is approved." Id. at 10 (quoting 55 Pa. Code § 3700.5(b)). CYF, however, did not identify any particular statute or regulation that was violated. Regardless, we explain below why Section 3700 does not support CYF's position.

[4] As noted above, CYF's brief did not identify any particular law that the trial court's order contravened. See generally CYF's Brief at 10-12.

Our standard of review in dependency cases is well-settled:

[W]e must accept the facts as found by the trial court unless they are not supported by the record. Although bound by the facts, we are not bound by the trial court's inferences, deductions, and conclusions therefrom; we must exercise our independent judgment in reviewing the court's determination, as opposed to its findings of fact, and must order whatever right and justice dictate. We review for abuse of discretion. Our scope of review, accordingly, is of the broadest possible nature. It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record. Nevertheless, we accord great weight to the court's fact-finding function because the court is in the best position to observe and rule on the credibility of the parties and witnesses.

In re W.M., 41 A.3d 618, 622 (Pa. Super. 2012) (citation omitted).

The federal Adoption Assistance and Child Welfare Act of 1980 (AACWA)[5] "provides that States will be reimbursed for a percentage of foster care and adoption assistance payments when the State satisfies the [AACWA's] requirements."[6] Id. at 623-24. Pennsylvania satisfied the

_____

[5] 42 U.S.C. §§ 670-679c. According to the W.M. Court, the Adoption and Safe Families Act of 1997 (ASFA) amended the AACWA to emphasize the health and welfare of the child. W.M., 41 A.3d at 623 n.2. The ASFA and AACWA are incorporated in Title IV-E of the Social Security Act.

[6] The W.M. Court explained:

It has been the national, State and local policy for many years pursuant to the [AACWA] to remove children from foster placement limbo where they know neither a committed parent nor can look toward some semblance of a normal family life that is legally and emotionally equivalent to a natural family. . . . States such as Pennsylvania, which participate in the [AACWA] program, are required to make reasonable efforts to return the child to [his

AACWA's requirements by establishing its Aid to Families with Dependent Children-Foster Care (AFDC-FC) program.[7] Pa. Dep't of Public Welfare v. United States, 411 F. Supp. 2d 586, 588-89 (W.D. Pa. 2006).[8] "AFDC–FC benefits cover 'the cost of food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a

_____

> or her] home following foster placement, but failing to accomplish this due to the failure of the parent to benefit by such reasonable efforts, to move toward termination of parental rights and placement of the child through adoption. Foster home drift, one of the major failures of the child welfare system, was addressed by the federal government by a commitment to permanency planning, and mandated by the law of Pennsylvania in its participation in [ASFA] (Public Law 105–89, 111, stat. 2119). Succinctly, this means that when a child is placed in foster care, after reasonable efforts have been made to reestablish the biological relationship, the needs and welfare of the child require CYS and foster care institutions to work toward termination of parental rights, [and] placing the child with adoptive parents. It is contemplated this process realistically should be completed within 18 months.

W.M., 41 A.3d at 623-24 (citation omitted).

[7] It appears that Pennsylvania's Department of Public Welfare (DPW) enacted the AFDC-FC program by establishing rules and regulations under 62 P.S. § 703. See 62 P.S. § 703 (stating, DPW "shall make and enforce all rules and regulations necessary and appropriate to the proper accomplishment of the child welfare duties"); accord 62 P.S. § 201 (DPW "shall have the power and its duties shall be . . . to promulgate regulations . . . as may be necessary to render the Commonwealth eligible for available Federal funds . . . .").

[8] Although "federal court decisions do not control the determinations of the Superior Court," we may rely on them to the extent we find them persuasive. See NASDAQ OMX PHLX, Inc. v. PennMont Secs., 52 A.3d 296, 303 (Pa. Super. 2012) (citation omitted).

child and reasonable travel to the child's home for visitation.' 42 U.S.C. § 675(4)(A)." Id. at 589.

In pertinent part, Section 672(a) of the AACWA states as follows:

(a) In general

(1) Eligibility

Each State with a plan approved under this part shall[9] make foster care maintenance payments on behalf of each child who has been removed from the home of a relative specified in section 606(a)[10] of this title (as in effect on July 16, 1996) into foster care if--

(A) the removal and foster care placement met, and the placement continues to meet, the requirements of paragraph (2); and

_____

[9] When a statute is unambiguous, the term "shall" is mandatory. Driscoll v. Arena, ___ A.3d ___, 2019 WL 2498935, *3 n.6 (Pa. Super. 2019) (en banc).

[10] Section 606(a), as in effect on July 16, 1996, provided as follows:

(a) The term "dependent child" means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home (other than absence occasioned solely by reason of the performance of active duty in the uniformed services of the United States), or physical or mental incapacity of a parent, and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece, in a place of residence maintained by one or more of such relatives as his or their own home, and (2) who is (A) under the age of eighteen, or (B) at the option of the State, under the age of nineteen and a full-time student in a secondary school (or in the equivalent level of vocational or technical training), if, before he attains age nineteen, he may reasonably be expected to complete the program of such secondary school (or such training);

42 U.S.C. § 606(a) (1996).

(B) the child, while in the home, would have met the AFDC eligibility requirement of paragraph (3).

(2) Removal and foster care placement requirements

The removal and foster care placement of a child meet the requirements of this paragraph if--

(A) the removal and foster care placement are in accordance with--

(i) a voluntary placement agreement entered into by a parent or legal guardian of the child who is the relative referred to in paragraph (1); or

(ii) a judicial determination to the effect that continuation in the home from which removed would be contrary to the welfare of the child and that reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made; . . .

\* \* \*

(3) AFDC eligibility requirement

(A) In general

A child in the home referred to in paragraph (1) would have met the AFDC eligibility requirement of this paragraph if the child--

(i) would have received aid under the State plan approved under section 602 of this title (as in effect on July 16, 1996) in the home, in or for the month in which the agreement was entered into or court proceedings leading to the determination referred to in paragraph (2)(A)(ii) of this subsection were initiated; or . . .

\* \* \*

(b) Additional qualifications

Foster care maintenance payments may be made under this part only on behalf of a child described in subsection (a) of this section who is--

(1) in the foster family home of an individual, whether the payments therefor are made to such individual or to a public or private child-placement or child-care agency, or . . .

42 U.S.C. § 672(a)-(b) (emphasis added). Section 672(c) defines "foster family home" as "a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing . . . ." 42 U.S.C. § 672(c).

In sum, the Court has construed the statute as follows:

the plain language of section 672 states that in order for a child to qualify for foster care maintenance payments, the removal from the home and placement in foster care must occur by either of two ways: a voluntary placement agreement by a parent or legal guardian or a judicial determination that a child's continued presence in the home would be contrary to his/her welfare.

W.M., 41 A.3d at 626 (emphasis in original and footnote and citation omitted).[11]

In Miller v. Youakim, 440 U.S. 125 (1979), the United States Supreme Court discussed the language and intent of the AACWA in resolving whether Illinois was required to make foster care payments to "children who reside

_____

[11] As noted above, CYF has not challenged Child's placement with M.K.

with relatives." Miller, 440 U.S. at 126. At that time, Illinois's AFDC-FC program distinguished between related and unrelated foster parents and provided payments only to children who lived with unrelated foster parents. Id. at 128-29. Illinois had placed two children in foster care with their older sister, Linda Youakim, and her husband (collectively, the Youakims). Id. at 130. Illinois, however, refused to make the foster care payments because the two children were related to Linda. Id. at 130. The Youakims sued Illinois.

In resolving the issue, the Miller Court acknowledged the statutory definition of "foster family home": "[T]he term 'foster family home' means a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State responsible for licensing homes of this type, as meeting the standards established for such licensing." Id. at 135 (quoting the statutory definition of "foster family home" as set forth in 42 U.S.C. § 608 (1996)).[12] Illinois contended that the definition of "foster family home" excluded homes where the foster parents were related to the foster children. Id. at 134. The Youakims countered that the definition of "foster family home" included homes in which the foster parents were related to the foster children. Id. at 131.

_____

[12] The Section 608 definition is identical to the present definition in Section 672.

The AFDC-FC program, the Miller Court explained, "was designed to meet the particular needs of all eligible neglected children, whether they are placed with related or unrelated foster parents." Id. at 134 (emphases added). The statutory definition of "foster family home," the Miller Court held, "[f]ar from excluding related caretakers, use[d] the broadest possible language when it refers to the homes of foster parents." Id. at 135 (emphasis added). The Miller Court continued, "[h]ad Congress intended to exclude related foster parents from the definition of 'foster family home,' it presumably would have done so explicitly . . . . Instead, the statute plainly states that a foster family home is the home of any individual licensed or approved by the State as meeting its licensing requirements . . . ." Id. at 137-38 (emphasis added and footnote omitted). Therefore, the Miller Court held that Illinois was required to pay foster care payments to the Youakims, who were related by blood to the foster children.[13] Id. at 146.

_____

[13] In Pa. Dep't of Public Welfare, the federal district court accurately summarized the Miller Court's additional rationale:

The [Miller] Court emphasized that the "overriding goal" of the AFDC–FC program was to provide the best available care for all dependent children removed from their homes because they were neglected. The Miller Court also emphasized Congress' obvious preference for care of dependent children by relatives, a policy underlying the categorical assistance program since its inception in 1935. Finally, Miller concluded that:

The overriding purpose [of AFDC–FC] was to assure that the most appropriate substitute care be given to those

Initially, to the extent CYF has argued that the trial court's decision contravenes public policy, CYF has waived any such argument. CYF failed to establish a record before the trial court upon which we may identify Pennsylvania's public policy addressing foster care payments to biological parents whose parental rights have been terminated. See generally Weaver v. Harpster, 975 A.2d 555, 563 (Pa. 2009).[14] Absent CYF's discussion of

_____

> dependent children so mistreated that a court has ordered them removed from their homes. The need for additional AFDC–FC resources—both monetary and service related—to provide a proper remedial environment for such foster children arises from the status of the child as a subject of prior neglect . . . .

Pa. Dep't of Public Welfare, 411 F. Supp. 2d at 595 (emphases in original and quotation marks and citations omitted).

[14] The Weaver Court observed:

> In our judicial system, the power of the courts to declare pronouncements of public policy is sharply restricted. Rather, it is for the legislature to formulate the public policies of the Commonwealth. The right of a court to declare what is or is not in accord with public policy exists only when a given policy is so obviously for or against public health, safety, morals, or welfare that there is a virtual unanimity of opinion in regard to it. Only in the clearest of cases may a court make public policy the basis of its decision. To determine the public policy of the Commonwealth, we examine the precedent within Pennsylvania, looking to our own Constitution, court decisions, and statutes promulgated by our legislature.

Weaver, 975 A.2d at 563 (citations and quotation marks omitted).

relevant authority, this Court is not in a position to identify the Commonwealth's public policy. See id.

Moreover, CYF has conceded that the trial court is not bound by the Pennsylvania Code. CYF's Brief at 10. It follows that the Pennsylvania Code does not bar the trial court from ordering foster payments to M.K. See In re Lowry, 484 A.2d 383, 386 (Pa. 1984) (holding that the Pennsylvania Code does not bind courts authorized by statute to issue orders acting in the child's best interests). Therefore, we need not resolve whether M.K. meets the definition of a "foster parent" under the Pennsylvania Code.[15]

In any event, CYF did not acknowledge that 55 Pa. Code § 3700.4 defines "foster parent" as an "individual responsible for providing foster family care" to a dependent child. See 55 Pa. Code § 3700.4. Section 3700.4 did not exclude a person biologically related to the dependent child from the definition of "foster parent." See id. It follows that M.K., although biologically

_____

[15] The guardian ad litem's brief suggested that CYF argued that "M.K. cannot be a licensed foster home, as he would not qualify for Title IV-E funding." Guardian ad litem's Brief at 12 n.3. The guardian ad litem then argues that this Court should take judicial notice that M.K. is now a licensed foster home and is currently receiving Title IV-E funding. Id.

Initially, we do not construe CYF's argument as suggesting that M.K. cannot be a licensed foster home. Regardless, we are reluctant to take judicial notice of such adjudicative facts because we cannot "accurately and readily determine[]" their "sources whose accuracy cannot reasonably be questioned." See Pa.R.E. 201. Even if CYF had raised such an argument, as we discussed above, Title IV-E funding does not require an actual license. See 42 U.S.C. § 672(c) (noting funding may be granted to home approved by, but not necessarily licensed by, appropriate state agency).

related to Child, qualifies as a "foster parent" under the Pennsylvania Code. See id.; see also Miller, 440 U.S. at 146.

CYF, however, has claimed that the trial court's order violated an unspecified law or regulation. CYF's Brief at 10. CYF, however, failed to identify any such law and arguably waived the issue. See In re Whitley, 50 A.3d 203, 209 (Pa. Super. 2012). But even assuming that CYF preserved the argument, CYF does not argue noncompliance with Section 672(a)(1). See 42 U.S.C. § 672(a)(1). In other words, CYF does not argue that Child was improperly removed or that M.K. is an inappropriate foster parent. See id. Rather, CYF argues that M.K. is an inappropriate recipient for foster care payments.

The statutory definition of "foster family home" has remained unchanged since Miller. Compare 42 U.S.C. § 672(c) (defining "foster family home" as a licensed or approved "foster family home for children"), with Miller, 440 U.S. at 127 n.1 (quoting identical language). Because the Miller Court construed the definition of "foster family home" as including any home in which the foster parents were related by blood to the foster children, it follows that nothing in Section 672(a)(1) bars M.K., who is biologically related to Child, from receiving foster care payments. See Miller, 440 U.S. at 137-38; In re Tameka M., 580 A.2d 750, 755 (Pa. 1990) (holding, "CYS has the duty to give financial support to dependent children"); In re Lowry, 484 A.2d at 388 (holding, "the court is guided by the overriding principle of acting 'to

provide for the care, protection, and wholesome mental and physical development of children'" under the Juvenile Act (quoting 42 Pa.C.S. § 6301)).

We summarize CYF's second and third arguments together. CYF argues that the trial court disregarded "that federal, state and local monies were paid when [CYF] was attempting to reunify [Child] with" M.K., but M.K. was unable to remedy the factors that led CYF to file a petition to terminate M.K.'s parental rights. CYF's Brief at 11. CYF alleges that since M.K.'s parental rights were terminated, he has not received any financial assistance. Id. But to provide payment now, CYF claims, "would be a windfall to M.K. [and it] would create bad precedent wherein parents could abandon their children and have their rights terminated and then later be paid to care for their own children." Id. In sum, CYF argues that because money was spent in an attempt to reunify Child and M.K. before M.K.'s parental rights were terminated, M.K. should be barred from receiving financial assistance after his parental rights were terminated. Id.

CYF also asserts that "[f]oster care payments are meant to help those persons who come forward to provide substitute care to children, who are not biologically their child and to whom they have no fiduciary duty to support." Id. CYF notes that upon a showing of financial need, it would provide non-monetary assistance in the form of food, transportation, and clothing

vouchers. Id. at 11-12. CYF argues that M.K. has not established any such financial need. Id. at 12.[16]

To the extent CYF has claimed that M.K. was required to show financial need before receiving foster care payments, CYF has not identified any legal authority for such a proposition. See id. at 11-12. As noted above, Child—not M.K.—filed the motion to have M.K. receive foster care payments because it would be in Child's best interests. See In re Lowry, 484 A.2d at 386. CYF has not identified any legal authority to support that when a child files such a motion, it is incumbent upon the foster parent, as recipient of such foster care payments, to establish financial need.[17]

As with CYF's initial public policy argument, CYF has cited no authority for the proposition that affirming the trial court's order would create a precedent permitting parents to abandon their children, have their parental rights terminated, and then be paid to care for their own children. See CYF's Brief at 11. Without any discussion by CYF, this Court cannot hold that foster care payments intended for Child's benefit should be withheld from being paid to M.K., Child's biological father, whose legal parental rights have been

_____

[16] CYF did not challenge M.K.'s physical custody of Child.

[17] Such a position, we note, would shift the focus away from whether such payments would be in the child's best interests. See In re Lowry, 484 A.2d at 386; see also Pa. Dep't of Public Welfare, 411 F. Supp. 2d at 595.

terminated a decade ago.[18]   See generally Weaver, 975 A.2d at 563.

Because CYF has not established the trial court violated the law, we affirm the

order below.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  8/19/2019

_____

[18] We acknowledge that the purpose of foster care payments is to benefit the
child.  See In re Lowry, 484 A.2d at 386.  We are reluctant to penalize the
child by withholding such payments because the child happens to be thriving
in the home of a biological parent whose parental rights have been terminated.