J-A15016-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.G., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: P.H., MATERNAL | : | |
| GRANDMOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 94 MDA 2018 |

Appeal from the Order Entered December 11, 2017
In the Court of Common Pleas of Huntingdon County Juvenile Division at
No(s):  CP-31-DP-0000032-2010

BEFORE:  PANELLA, J., MURRAY, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY MURRAY, J.:                    **FILED AUGUST 03, 2018**

P.H. (Maternal Grandmother) appeals from the order which changed the permanent placement goal for her minor granddaughter, Ki.G. (Child), born in May 2008, from reunification to adoption.  After careful review, we affirm.

Maternal Grandmother is the biological grandmother of four granddaughters: S.H., Child, A.G., and Ka.G.  S.H. currently resides with Maternal Grandmother and is not part of this appeal.[1]  The family originally became known to the Huntington County Children and Youth Services Agency (the Agency) in August 2010 after reports were received alleging that Child lacked proper parental care and control.  Dependency Petition, 8/3/10, at 3 (unpaginated).  The report further alleged that Child's mother, S.G. (Mother),

_____

[1] Maternal Grandmother appealed the goal change orders for A.G. and Ka.G., which we address by separate memorandum at Docket Nos. 93 MDA 2018 and 95 MDA 2018.

had a criminal record that included drug charges and was refusing to cooperate with the Agency. *Id.* On August 13, 2010, the juvenile court adjudicated Child dependent, however, physical custody of Child remained with Mother. In November 2010, Mother placed Child in the care of Maternal Grandmother and moved to Pittsburgh with her three other children. On July 6, 2011, the Agency filed a petition to transfer physical and legal custody of Child to Maternal Grandmother and appoint her as Child's legal custodian. The juvenile court granted the petition on August 22, 2011. Thereafter, having determined that Child had been placed with a fit and willing relative, the Agency filed, and the juvenile court granted, a petition to terminate court supervision. Order, 8/22/11.

> [Child] was already in the custody of [Maternal Grandmother] when Allegheny County placed S.H., A.G., and [Ka.G.] in kinship care with [Maternal Grandmother] on July 1, 2015. This placement occurred after the natural mother of the children was hospitalized following an automobile accident, which ultimately claimed her life approximately three weeks later. Allegheny County adjudicated [Ka.G.], A.G. and S.H. dependent on September 2, 2015. The Juvenile Division of the Allegheny County Court of Common Pleas subsequently transferred the cases to the Juvenile Division of the Huntingdon County Court of Common Pleas. When it became evident that [Maternal Grandmother] was overwhelmed with attempting to care [for] all four of the children, [the Agency] placed [Child, A.G. and Ka.G.] in alternative foster care settings.[2] The fourth child, whose case is not subject to this appeal, remains in kinship care with [Maternal Grandmother]. The

---

[2] Concerns were raised that Maternal Grandmother was leaving Child home alone. Dependency Petition, 12/3/15, at 3. Child has been diagnosed with cerebral palsy and mental health issues, and requires constant supervision and care.

parental rights of all of the Natural Fathers except S.H.'s (who is not subject to this appeal) have been terminated.

[Maternal Grandmother] is very well-intentioned, and has always attempted to meet the needs of her granddaughters. From the inception of these dependency matters, however, we were concerned that [Maternal Grandmother] was unable to adequately care for all of the children simultaneously. When [Maternal Grandmother] assumed the care of all four of her grandchildren in July of 2015, she was working at Weis Markets in State College, Centre County and was driving 45 minutes each way to go to work, and also leaving the children in the care of her 89-year-old mother. Services were put in place by [the Agency], but even with those services [Maternal Grandmother] was "overwhelmed" and didn't have time to address all of her household needs. The children were removed from her custody due to home condition issues and the inability to appropriately care for all of the children at one time.[3]

Juvenile Court Opinion, 2/13/18, at 1-2 (footnotes omitted).

On November 8, 2017, the court terminated the parental rights of Child's father. Trial Court Opinion, 2/13/18, at Ex. A. That same day, the Agency petitioned for the juvenile court to conduct a permanency review hearing for Child for the purpose of changing her permanency goal from reunification to adoption. The court held a permanency review hearing on December 1, 2017, during which the Agency presented the testimony of Emily Dixon, the caseworker assigned to the family. Ms. Dixon testified regarding some concerns with Child during visits with Maternal Grandmother. N.T., 12/1/17, at 5. In particular, Ms. Dixon observed "significant bruising" on Child's arms and legs after attending visits with Maternal Grandmother. *Id.* Ms. Dixon

---

[3] The juvenile court adjudicated Child dependent for the second time on December 4, 2015.

conducted an investigation, but was unable to determine whether the bruising was due to Child's own clumsiness or whether the bruises were inflicted by Maternal Grandmother. *Id.* at 5-6. Otherwise, Ms. Dixon reported that Child is doing well in her current placement and that the placement is appropriate and necessary. *Id.* at 6, 9.

Maternal Grandmother testified on her own behalf and presented the testimony of J.L., Child's foster mother, as an adversarial witness. Maternal Grandmother attempted to question the fitness and ability of J.L. to care for Child based on J.L.'s recent eye surgery. At the conclusion of the hearing, Maternal Grandmother expressed her disagreement with the Agency's position of changing Child's permanency goal to adoption. *Id.* at 26. Rather, Maternal Grandmother argued that Child should be returned to her care. *Id.*

On December 11, 2017, the juvenile court entered its order changing Child's permanent placement goal from reunification to adoption. Maternal Grandmother timely filed a notice of appeal and concise statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).

Maternal Grandmother raises the following issues for our review (reordered for ease of discussion):

1. Did the court below err when it continued Child's placement in a foster home, where [Maternal Grandmother] is the legal guardian of Child, and is fully capable of caring for Child and meeting her needs?

2. Did the court below err when it found that the placement of Child continued to be necessary and appropriate, when the evidence showed that [Maternal Grandmother] completed all

tasks set forth in the service plan that was established for [Maternal Grandmother] to reunify with Child?

3. Did the court below err when it changed the permanent placement goal to Adoption, despite the fact that it is in Child's best interest to return to [Maternal Grandmother]?

4. Did the court below err when it found that Child's placement was the least restrictive placement that meets the needs of Child, when [Maternal Grandmother] is Child's legal guardian and is fully capable of meeting Child's needs?

5. Did the court below err when it found that reasonable efforts had been made to place Child and her siblings together, when Child has one sibling residing with [Maternal Grandmother], and two siblings residing in another foster home, and [Maternal Grandmother] is fully capable of caring for Child and all of her siblings together in [Maternal Grandmother's] home?

6. Did the court below err when it found that [Maternal Grandmother's] compliance with the permanency plan was "moderate," when the evidence showed that [Maternal Grandmother] had completed all tasks set forth in the service plan that was established for [Maternal Grandmother] to reunify with Child?

7. Did the court below err when it found that [Maternal Grandmother's] progress towards alleviating the circumstances that necessitated the original placement was "moderate," when the evidence showed that [Maternal Grandmother] had done all that was asked of her to reunify with Child?

Maternal Grandmother's Brief at 20-21 (juvenile court answers omitted).[4]

_____

[4] We note Maternal Grandmother's violation of Pennsylvania Rules of Appellate Procedure 2119. The Rule provides, in pertinent part, "[t]he argument shall be divided into as many parts as there are questions to be argued[.]" Pa.R.A.P. 2119(a). Here, Maternal Grandmother presents seven issues for our review, but only divides her argument into four sections. However, because Maternal Grandmother's violation does not substantially impede appellate review, we decline to quash the appeal. *See In re Ullman*, 995

> [T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Maternal Grandmother's first two issues are related and thus we address them together. Maternal Grandmother argues that the juvenile court erred in concluding that Child's placement in foster care continued to be necessary and appropriate. Maternal Grandmother's Brief at 55. Maternal Grandmother asserts that "the fact that the parental rights of [Child's] father were recently terminated utterly fails to support the conclusion that [Maternal Grandmother] cannot care for [Child], or that [Child] should not be returned to her legal guardian with whom she had resided for over five years prior to the current dependency case." *Id.* at 56.

At the permanency review hearing, Child's foster mother, J.L., testified that when Child first entered her care, she was "hyperactive to the point where it would be self-harming the things she could get into." N.T., 12/1/17, at 16. J.L. explained that through medication management and therapy, Child is now able to sit, play and interact appropriately with other children. *Id.* at 16-17. Child can sit through meals and is more communicative. *Id.* at 17.

---

A.2d 1207, 1211 (Pa. Super. 2010) ("This Court may quash or dismiss an appeal if the appellant fails to conform to the requirements set forth in the Pennsylvania Rules of Appellate Procedure.").

In its opinion, the juvenile court reiterated its rationale that Child's placement in a therapeutic foster home continued to be necessary and appropriate. Juvenile Court Opinion, 2/13/18, at 6. In particular, the juvenile court stated:

> [Child] has very serious special needs and this Court is tasked with ensuring her needs and best interests are met. She is currently living in, and has resided in a therapeutic foster home since November 23, 2016. We acknowledge that [Maternal Grandmother] has successfully completed the tasks in the service plans, however, the special needs and overall health and welfare of [Child] are best addressed and supported in her current placement. There is a substantial risk that she will regress if removed from her current specialized foster care setting. . . .

*Id.*

Upon review, the record supports the juvenile court's decision not to reunite Child with Maternal Grandmother, and that Child's placement in her therapeutic foster home continues to be necessary and appropriate. Moreover, the record also reflects that there was sufficient evidence to allow the juvenile court to make a determination regarding Child's needs and the appropriateness of reunification.

In her third issue, Maternal Grandmother argues that the juvenile court erred by changing Child's permanency goal from reunification to adoption. Maternal Grandmother's Brief at 48. Maternal Grandmother maintains that she desires to have Child "returned to her home and to adopt her, and has demonstrated that she is able to care for Child along with her siblings." *Id.* at 47. Maternal Grandmother contends that it is in Child's best interest to

- 7 -

return to Maternal Grandmother "so that she can reap the benefits of her established family relationships and be raised alongside her siblings by her grandmother." *Id.* at 48.

In considering a goal change petition, the juvenile court must apply the following analysis:

> Pursuant to [42 Pa.C.S.A.] § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted). We are mindful, however, that "[w]hen the trial court's findings are supported by competent evidence of record, we will affirm 'even if the record could also support an opposite result.'" *In re N.C.*, 909 A.2d 818, 823 (Pa. Super. 2006) (quoting *In re Adoption of R.J.S.*, 901 A.2d 502, 506 (Pa. Super. 2006)).

Furthermore, this Court has stated:

Placement of and custody issues pertaining to dependent children are controlled by the Juvenile Act [42 Pa.C.S. §§ 6301-65], which was amended in 1998 to conform to the federal Adoption and Safe Families Act ("ASFA"). The policy underlying these statutes is to

prevent children from languishing indefinitely in foster care, with its inherent lack of permanency, normalcy, and long-term parental commitment. Consistent with this underlying policy, the 1998 amendments to the Juvenile Act, as required by the ASFA, place the focus of dependency proceedings, including change of goal proceedings, on the child. Safety, permanency, and wellbeing of the child must take precedence over all other considerations, including the rights of the parents.

*Id.* (internal citations and footnotes omitted). "The trial court must focus on the child and determine the goal with reference to the child's best interests, not those of the parents." *In re S.B.*, 943 A.2d 973, 978 (Pa. Super. 2008).

Our review of the certified record supports the juvenile court's findings. Child was initially placed in foster care in December 2015 and has been in her current permanent therapeutic foster home since November 2016. Although testimony was presented indicating that Maternal Grandmother has worked toward achieving her permanency goals, the reality is that Maternal Grandmother is incapable of caring for Child due to Child's special needs. By the time of the goal change hearing, Child had been in care almost 24 months, residing in her current therapeutic foster home for over a year. Child's foster mother is a permanent placement resource. While it is true that Maternal Grandmother maintains a relationship with Child during her weekend visits, it was within the juvenile court's discretion to conclude that this relationship is outweighed by Child's need for permanence and stability.

Based on the record, we conclude that the juvenile court did not abuse its discretion in finding that Child's welfare would best be served by changing

the goal to adoption. We may not disturb it on appeal. ***See N.C.***, 909 A.2d at 823.

In her fourth issue, Maternal Grandmother contends that the juvenile court erred by not returning Child to Maternal Grandmother's custody when it was the least restrictive placement. Maternal Grandmother's Brief at 50. Maternal Grandmother argues that placing Child in her home would provide Child with the opportunity to live with her legal guardian and siblings. ***Id.*** Moreover, Maternal Grandmother contends that the Agency failed to prove that "therapeutic foster care" is necessary for Child. ***Id.*** at 51.

Section 6301 of the Juvenile Act sets forth the purpose of the Act, in relevant part, as:

> **(b) Purposes.—**This chapter shall be interpreted and construed as to effectuate the following purposes:
>
> (1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.
>
> (1.1) To provide for the care, protection, safety and wholesome mental and physical development of children coming within the provisions of this chapter.
>
> . . .
>
> (3) To achieve the foregoing purposes in a family environment whenever possible, separating the child from parents only when necessary for his welfare, safety or health or in the interests of public safety, by doing all of the following:
>
> > (i) employing evidence-based practices whenever possible . . .

42 Pa.C.S.A. § 6301(b)(1), (b)(1.1), (b)(3)(i).

The Child Protective Services Law ("CPSL") charges county agencies with providing services consistent with the goals of the agency as follows:

**(a) Program objectives.**—Each county agency is responsible for administering a program of general protective services to children and youth that is consistent with the agency's objectives to:

(1) Keep children in their own homes, whenever possible.

(2) Prevent abuse, neglect and exploitation.

(3) Overcome problems that result in dependency.

(4) Provide temporary, substitute placement in a foster family home or residential child-care facility for a child in need of care.

(5) Reunite children and their families whenever possible when children are in temporary, substitute placement.

(6) Provide a permanent, legally assured family for a child in temporary, substitute care who cannot be returned to his own home.

(7) Provide services and care ordered by the court for children who have been adjudicated dependent.

23 Pa.C.S.A. § 6373(a).

Here, the juvenile court opined:

[Child] has extensive special needs and is currently living in a home with caregivers well trained in caring for and supporting children with intellectual and developmental disabilities. [Child] is receiving the support she needs and is thriving in her current environment. [Maternal Grandmother] does not have the ability to meet the needs of the child on a full-time basis. It is our hope that [Maternal Grandmother] will be able to maintain a significant relationship with her granddaughter in the future, but to be her

- 11 -

caregiver and to raise the child would be contrary to the child's best interests.

Juvenile Court Opinion, 2/13/18, at 8.

At the hearing, J.L. testified that she has served as a foster parent for 30 years and has cared for "well over 75" children. N.T., 12/1/17, at 15. All of those children have been special needs children, with "maybe ten" having autism. *Id.* Of the children she has fostered, J.L. has adopted six and has legal guardianship of two. *Id.* at 16. J.L. indicated that she is trained to care for children with special needs. *Id.*

We note that this Court stated, "it is not for this [C]ourt, but for the trial court as fact finder, to determine whether [a child's] removal from [his/]her family was clearly necessary." *A.N. v. A.N.*, 39 A.3d 326 (Pa. Super. 2012) (quoting *In the Interest of S.S.*, 651 A.2d 174, 177 (Pa. Super. 1994)). Upon review, the record supports the juvenile court's finding that Child's placement in a therapeutic foster home is the least restrictive means to meet her needs.

In her fifth issue, Maternal Grandmother asserts that the Agency failed to make reasonable efforts to achieve the permanency goal of reunification. Under the Juvenile Act, courts must conduct regular permanency hearings to review the permanency plan of the child. 42 Pa.C.S.A. § 6351(e)(1). At each permanency hearing, the trial court must determine, *inter alia*, "whether reasonable efforts were made to finalize the permanency plan in effect." 42 Pa.C.S.A. § 6351(f)(5.1).

Our Supreme Court has described the purpose behind the reasonable-efforts requirement as follows:

> [T]he federal government enacted [the Adoption and Safe Families Act (ASFA)] and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption. To accomplish this goal, the federal government tied federal funding of foster care and adoption assistance to each state's adoption of a plan regarding its foster care system. 42 U.S.C. § 671 (setting forth the requirements of a state plan "[i]n order for a State to be eligible for payments" for foster care and adoption assistance). The federal government required state plans to provide that "reasonable efforts shall be made to preserve and reunify families," absent certain exceptions. *Id.* § 671(a)(15)(B). Section 672 in turn provides, *inter alia*, that a state should "make foster care maintenance payments on behalf of each child" if "reasonable efforts of the type described in section 671(a)(15) of this title for a child have been made." *Id.* § 672(a)(1), (2)(A)(ii). The federal payments to the states are likewise based upon the Section 672 payments. *Id.* § 674; *see also* 45 C.F.R. 1356.21(b) (detailing that agencies must make reasonable efforts "to effect safe reunification" to be eligible to receive federal foster care maintenance payments).

*In re D.C.D.*, 105 A.3d 662, 675-76 (Pa. 2014) (footnote omitted).

Although neither federal nor Pennsylvania law defines "reasonable efforts," our case law has made clear that the focus of the Juvenile Act is on the dependent child, as opposed to the parents. *See In re J.R.*, 875 A.2d 1111, 1118 (Pa. Super. 2005). "By requiring only 'reasonable efforts' to reunify a family, the statute recognizes that there are practical limitations to such efforts." *Id.* at 1118 n. 5 (citing 43 Pa.C.S.A. § 6351(e)&(f)). This Court has explained that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to help parents assume their parental

duties." **In re A.L.D.**, 797 A.2d 326, 340 (Pa. Super. 2002) (citing **In re J.W.**, 578 A.2d 952, 959 (Pa. Super. 1990)).

Maternal Grandmother argues that the juvenile court erred in concluding that the Agency made reasonable efforts to reunify Child with Maternal Grandmother. Maternal Grandmother's Brief at 56. In particular, Maternal Grandmother contends that while the permanency review order indicates that services were being provided to the family, in reality, all services had "been discontinued in October of 2016, when the Raystown Developmental Services family reunification case was closed." **Id.** at 56-57.

Timeframes in the Juvenile Act indicate that a component of reasonable efforts is diligence by the agency. The law prioritizes reunification initially, but if reunification is not viable "after reasonable efforts have been made to reestablish the biological relationship," child welfare agencies must "work toward termination of parental rights, placing the child with adoptive parents," ideally within 18 months. **In re B.L.L.**, 787 A.2d 1007, 1016 (Pa. Super. 2001). "While this 18-month time frame may in some circumstances seem short, it is based on the policy that a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting." **In re R.M.G.**, 997 A.2d 339, 349 (Pa. Super. 2010) (citations omitted). As our Supreme Court has recognized, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly." **In re T.S.M.**, 71 A.3d 251, 269 (Pa. 2013).

Our review of the record reveals that the Agency made reasonable efforts to provide Maternal Grandmother with services toward achieving reunification. Although the record does not reveal exactly when Maternal Grandmother began receiving reunification services, the record does reflect that she received services as early as March 2016. *See* Permanency Review Order, 3/11/16, at 1. The Agency continued to provide these services to Maternal Grandmother until October 2016. After services were discontinued, the parties filed a joint stipulation requesting that Child be placed with J.L., a permanent therapeutic foster home, as it would be appropriate and in Child's best interest. Stipulation, 118/23/16, at ¶¶ 12-14, 18. By the time of the goal change hearing, Child had been in foster care for 24 months and was thriving in that placement.

Furthermore, we note that the juvenile court is in the best position in these situations to listen to the agency's recommendations and determine credibility. *See In re W.M.*, 41 A.3d 618, 622 (Pa. Super. 2012). Here, having heard from the Agency, the juvenile court concluded that the Agency provided reasonable efforts to reunify Maternal Grandmother with Child. However, despite these efforts, Maternal Grandmother was not a viable placement capable of ensuring that Child's needs and best interests were met. The juvenile court concluded that Child's placement in a therapeutic foster home was in Child's best interest as it was best equipped to meet her special needs. The juvenile court did not abuse its discretion in making those findings.

Finally, Maternal Grandmother's six and seventh issues assert that the juvenile court erred in finding that Maternal Grandmother had made only moderate progress toward alleviating the circumstances that led to Child's initial placement, and toward complying with the Agency's permanency plan. In particular, Maternal Grandmother notes that during the December 1, 2017 permanency review hearing, the juvenile court agreed that Maternal Grandmother was more than moderately compliant. We agree.

The record reveals that during the December 1, 2017 permanency review hearing, Maternal Grandmother objected to the Agency's proposed permanency review order, which listed Maternal Grandmother's compliance with the permanency review plan as "moderate." Upon stating her objection, the court agreed, stating "I don't disagree with you. I'm not going to – I am going to make a decision as to whether it would be substantial or full." N.T., 12/1/17, at 27. Accordingly, the record supports Maternal Grandmother's assertion that her compliance was more than "moderate."

However, despite the fact that Maternal Grandmother's compliance with the permanency plan was greater than "moderate," we conclude that, for all the reasons stated above, the record still supports the juvenile court's decision to change Child's permanency goal from reunification to adoption. Moreover, as the juvenile court emphasized:

> [T]he standard for reunification in dependency matters is not that of the progress of the parent (or in this case, grandparent), but what is in the child's best interest. It is abundantly clear to us that it is in [Child's] best interest [ ] to remain in [her current

foster] home where her unique needs are properly addressed and where she is continually making progress.

Juvenile Court Opinion, 2/13/18, at 6. Accordingly, Maternal Grandmother is not entitled to relief.

Based on the foregoing, we conclude that the juvenile court did not commit an error of law or abuse its discretion by changing Child's permanency goal from reunification to adoption. Therefore, we affirm the court's permanency review order.[5]

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 08/03/2018

---

[5] We are cognizant of and note that the juvenile court has demonstrated thoughtful consideration in presiding over this case, including its efforts to maintain the siblings' relationships through their visits with Maternal Grandmother every other weekend.