J-A15023-19

2019 PA Super 224

| | | |
|---|---|---|
| IN THE INTEREST OF: J.L., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.L., A MINOR | : | No. 240 EDA 2019 |

Appeal from the Order Entered December 11, 2018
In the Court of Common Pleas of Montgomery County
Domestic Relations at No(s): CP-46-DP-0000278-2018

BEFORE: BENDER, P.J.E., GANTMAN, P.J.E., and COLINS*, J.

OPINION BY GANTMAN, P.J.E.: **FILED JULY 23, 2019**

Appellant, J.L. (born June 2002), appeals from the order entered in the Montgomery County Court of Common Pleas, which adjudicated him dependent and temporarily placed J.L. in a youth residential facility, due to his habitual truancy. We affirm.

In its opinion, the trial court accurately set forth the relevant facts and procedural history of this case as follows:

> Turning to the facts of record, J.L. has a long history of truancy, with attendance issues beginning three years ago, when he was in the seventh grade. Now, in the 2018-2019 academic year, he is sixteen years old but is only in the ninth grade, and is currently enrolled in that grade for the second year in a row. In three years, J.L. lost one and one-half years of education due to his truancy while the school district and [the Montgomery County Office of Children and Youth ("OCY")] attempted to treat it outside of dependency proceedings. This was the single most important fact regarding the decision facing the undersigned on December 11th: whether to briefly remove J.L. from his home while

_____
* Retired Senior Judge assigned to the Superior Court.

developing a diagnosis and treatment for his truancy, or continue with the less-restrictive options that had proved unsuccessful for three years.

The facts of record begin with J.L.'s 2017-2018 academic year, when his school notified OCY that he was habitually truant. He had accumulated twenty-two unexcused absences by April of 2018. The OCY case worker did not file a dependency petition at that time, but instead exercised her judgment as to the "least restrictive option"…and chose to employ "alternative services"…of the Academy Truancy Diversion Program. Even with the deployment of that alternative service in April of 2018, J.L. accumulated a total of 44 unexcused absences for the 2017-2018 academic year.

J.L's 2018-2019 academic year began on September 4, 2018, yet by the reckoning of the undersigned he accumulated 31 unexcused absences by the end of October. Nonetheless, after J.L.'s school notified OCY about his ongoing truancy in October 2018, the OCY case worker again chose to divert his case to the Academy Truancy Diversion [Program]. The OCY case worker did not formally open a case until November 5, 2018, after the Academy case worker reported that J.L. would not respond, except to lock his bedroom door and refuse to open it, when the case worker would arrive at his home in the morning to personally support him getting to school.

On November 14, 2018, the OCY case worker met with J.L. and his parents at their home. The case worker gave J.L. goals that she expected him to meet, and although he appeared cooperative, he failed to explain why he refused to attend school. The school attendance record shows that J.L. was absent every day from November 14th through November 28th, …when the OCY case worker and a Multi-Systemic Therapist met with J.L. and his parents at his home[.] At that time, the case worker notified J.L. and his parents that she had filed a dependency petition and that a hearing on the petition would be held on December 11th. Once again, J.L. agreed to attend school. Once again, however, he was unable to stand by his intention, even knowing that he would be appearing [in] court shortly.

Exhibit OCY-2 shows an unbroken record of 48 unexcused absences from November 29th through December 5, 2018.

On December 6, 2018, the OCY case worker again met with J.L. and his parents in their home to discuss his ongoing truancy, and he proffered the excuse that he overslept and missed the school bus because he is tired in the morning. His case worker encouraged him to attend school in the few days remaining before the hearing on the dependency petition, but he could not bring himself [to] attend a single day, even as his date in court loomed less than a week away.

The undersigned received all of the foregoing facts at the hearing on December 11, 2018 and found them to be clear and convincing. Years of truancy indicated that J.L.'s parents did not know what to do to support his attendance at school. Their palpable anxiety, as witnessed by the undersigned, evidenced by their furrowed brows, reinforced that conclusion. J.L. needed immediate intervention because of the amount of schooling he had lost, and intervention by placement was preferable because none of the interventions in the home had worked. J.L.'s parents agreed with placement. Although the need for removal from home was obvious to the undersigned and J.L.'s parents, the undersigned believed a short-term program to alleviate J.L.'s well-entrenched truancy would be sufficient. The recommended Multi-Systemic Therapy, which had just begun, …could be continued while he was in placement[.] The undersigned found the foregoing facts to be clear and convincing evidence that reasonable efforts were made to prevent the need for removing J.L. from his home, and that it would be contrary to J.L.'s welfare to permit him to remain at home.

On December 19, 2018, J.L.'s lawyer filed a motion for reconsideration of the order of December 11th. While that motion was pending, the staff at Bethany Children's Home gave J.L. a furlough from December 24th through 26th, and J.L. celebrated Christmas at home with his family. On January 4, 2019, the undersigned filed an order scheduling a hearing on the motion for reconsideration simultaneously with the dispositional hearing on January 8th. At the hearing, OCY, J.L.'s parents and J.L. agreed to an order

returning him to the custody of his parents. The undersigned filed a written order to that effect at the conclusion of the hearing. Prior to that, J.L. spoke in court, and said, "I just want to say, Your Honor, that I definitely learned my lesson from going to Bethany for the thirty days, and I will make an effort going to school and doing what I need to do to make it right."

In view of the agreed order returning J.L. home, the undersigned asked counsel for J.L. if she would withdraw her motion for reconsideration of the order of December 11th. She responded, "It's our position that it's moot." Notwithstanding that she understood her motion for reconsideration to be moot, she stated that she would take the unusual step of filing an appeal from the December 11th order. [On January 10, 2019,] counsel for J.L. filed the notice of appeal [and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i)].

(Trial Court Opinion, filed January 31, 2019 at 6-11) (internal citations omitted).[1]

J.L. raises the following issues for our review:

---

[1] OCY claims this appeal is interlocutory because at the time the court adjudicated J.L. dependent and removed him from the home, the court had contemplated further proceedings. Nevertheless, the order on appeal constituted a change of status for J.L., which was deemed final, when entered, for purposes of appeal. *See In re E.B.*, 898 A.2d 1108 (Pa.Super. 2006) (holding adjudication of child as dependent is change of status deemed final when entered for appeal purposes); *In re Interest of M.B.*, 565 A.2d 804 (Pa.Super. 1989), *appeal denied*, 527 Pa. 601, 589 A.2d 692 (1990) (explaining that determination of finality is not to be made merely by deciding whether order in question has technically ended litigation; we must examine practical consequences of order in context of statutory and regulatory scheme governing disposition of dependent children; recognizing there are certain crucial points of finality in dependency proceedings when appellate review is appropriate despite fact that court might later modify earlier decisions after conducting further review hearings).

DID THE JUVENILE COURT COMMIT A LEGAL ERROR BY UTILIZING THE "BEST INTERESTS" STANDARD WHEN REMOVING A CHILD FROM HIS SAFE AND LOVING PARENTAL HOME, AS OPPOSED TO APPLYING THE MORE STRINGENT "CLEAR NECESSITY" STANDARD?

DID THE JUVENILE COURT ABUSE ITS DISCRETION IN REMOVING A CHILD FROM A SAFE AND LOVING HOME TO PLACE HIM IN A CONGREGATE CARE YOUTH SHELTER FOR TRUANCY WHERE, AMONG OTHER THINGS, THE AGENCY DID NOT IMPLEMENT IN-HOME OR COMMUNITY-BASED SERVICES AFTER OPENING A FORMAL CASE AND THE JUVENILE COURT WAS NOT PRESENTED WITH ANY EVIDENCE REGARDING CHILD'S EDUCATIONAL NEEDS, PSYCHOLOGICAL AND EMOTIONAL NEEDS, OR DISABILITIES?

(J.L.'s Brief at ix).[2]

Preliminarily, we observe:

As a general rule, an actual case or controversy must exist at all stages of the judicial process, or a case will be dismissed as moot. An issue can become moot during the pendency of an appeal due to an intervening change in the facts of the case or due to an intervening change in the applicable law. In that case, an opinion of this Court is rendered advisory in nature. An issue before a court is moot if in ruling upon the issue the court cannot enter an order that has any legal force or effect. …

\* \* \*

[T]his Court will decide questions that otherwise have been rendered moot when one or more of the following exceptions to the mootness doctrine apply: 1) the case involves a question of great public importance, 2) the question presented is capable of repetition and apt to elude appellate review, or 3) a party to the controversy will suffer some detriment due to the decision of the trial court.

---

[2] J.L. does not challenge the court's adjudication of dependency. Instead, J.L. complains solely about his removal from the home.

*In re D.A.*, 801 A.2d 614, 616 (Pa.Super. 2002) (*en banc*) (internal citations and quotation marks omitted). "The concept of mootness focuses on a change that has occurred during the length of the legal proceedings." *In re Cain*, 527 Pa. 260, 263, 590 A.2d 291, 292 (1991). "If an event occurs that renders impossible the grant of the requested relief, the issue is moot and the appeal is subject to dismissal." *Delaware River Preservation Co., Inc. v. Miskin*, 923 A.2d 1177, 1183 n.3 (Pa.Super. 2007). *See also In re J.A*., 107 A.3d 799 (Pa.Super. 2015) (holding order that had temporarily appointed KidsVoice as medical guardian for child, but later reappointed mother as child's medical guardian, was capable of repetition and apt to evade appellate review; nothing prevented juvenile court from again appointing KidsVoice as child's medical guardian; juvenile court's statements on record suggested its decision to appoint mother as child's medical guardian was on trial basis; child's best interest persists throughout dependency case; change in status can happen quickly in dependency cases).

Further, at all times relevant to these proceedings, the Public School Code of 1949 defined "compulsory school age" as follows:

### § 13-1326. Definitions

**"Compulsory school age"** shall mean the period of a child's life from the time the child's parents elect to have the child enter school and which shall be no later than eight (8) years of age until the child reaches seventeen (17) years of age. The term does not include a child who holds a certificate of graduation from a regularly accredited, licensed, registered or approved high school.

24 P.S. § 13-1326 (effective July 1, 2018). On June 28, 2019, the legislature recently amended the definition of "compulsory school age" to between six and eighteen years of age. The amendment takes effect on September 26, 2019. **See** H.B. 1615, 203 Gen. Assem., Reg. Sess. (Pa. 2019) (amending definition of compulsory school age; stating Section 13-1326 will be effective in 90 days). The amendment shall apply to academic years commencing after the effective date. **See id.**, *Note*.

Instantly, the court adjudicated J.L. as dependent and temporarily removed him from the home on December 11, 2018. On January 8, 2019, the court held a dispositional hearing and returned J.L. to the care of his parents. Thus, the issue is technically moot because the court has already granted J.L. his requested relief to be returned home. **See In re Cain, supra**; **In re D.A., supra**; **Delaware River Preservation Co., supra**. Also, as of June 2019, J.L. is 17 years old. Consequently, under the statute **currently** in effect, J.L. is no longer subject to compulsory education. **See** 24 P.S. § 13-1326 (effective July 1, 2018). In other words, J.L. has essentially "aged out" under the current statute, so the issue concerning J.L.'s removal from the home would not be capable of repetition, and the juvenile court no longer has authority to take any action over J.L. regarding his truancy. Under the new statute taking effect on September 26, 2019, however, J.L. might be subject to compulsory education until he is 18 years old. If so, then the issue on appeal could be capable of repetition, in the event the juvenile court again

removes J.L. from his home if his truancy problems persist in the next academic school year. The issue could similarly evade appellate review due to the changeability of J.L.'s needs during dependency proceedings. ***See In re J.A., supra***. Under these circumstances, an exception to the mootness doctrine might exist, so we elect to review the merits of his appeal. ***See generally First Valley Bank v. Steinmann***, 384 A.2d 949 (Pa.Super. 1978) (explaining general principle that motions to dismiss must be considered in light of Pennsylvania's preference to conduct merits review).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Wendy Demchick-Alloy we conclude J.L.'s issues merit no relief. The trial court opinion comprehensively discusses and properly disposes of the questions presented. (***See*** Trial Court Opinion at 11-19) (finding: removal of J.L. from home was "clear necessity" because he was unable to participate in and benefit from less-restrictive alternative services already tried, and J.L. had missed one and one-half years of school in three year period; when caseworker sought to meet with J.L. in past to discuss truancy issues, J.L. locked his door and refused to communicate with caseworker and stated only that he constantly overslept and missed school bus; reasonable efforts were made to avoid J.L.'s removal from home but those efforts were unsuccessful, so it would have been contrary to his welfare to permit him to remain at home; removal was intended to be temporary, not long-term placement and

- 8 -

reunification of J.L. and his parents was unquestionable goal; J.L.'s parents agreed J.L. should be removed from home; under these circumstances, short-term removal of J.L. from home was consistent with preference for preserving family unity; guardian *ad litem* ("GAL") did not produce or seek continuance to offer more evidence concerning J.L.'s individualized education program ("IEP") and education records; notably, GAL declined to speak with school official after adjudication hearing even though school official had copy of J.L.'s IEP and was prepared to discuss it; J.L. did not demonstrate any unique education needs which would militate against J.L.'s temporary removal from home; under circumstances of case, immediate short-term removal of J.L. from his home was clearly necessary to promote J.L.'s welfare and preserve long-term family unity).  The record supports the court's decision.

Additionally, the record confirms the court applied the appropriate "clear necessity" standard at the time it ordered removal.  At the December 11, 2018 adjudication hearing, counsel for OCY recounted how numerous prior efforts to alleviate J.L.'s truancy had failed.  Significantly, J.L. met with an OCY caseworker and Multi-Systemic Therapist, during the two weeks before the adjudication hearing, who stressed the importance of attending school until the adjudication hearing.  J.L. agreed he would attend school, but he did not follow through.  The court explained how J.L. was "digging [himself] a hole that's way deep—not too deep to get out of it, but way deep" and "academically capable, but digging [his] heels in."  (N.T. Adjudication Hearing,

12/11/18, at 10, 12). The court further stated: "[W]e need to do something quickly, because if we keep doing the same thing again and again, when we just keep sending you home, it's not working. It's not working." (*Id.* at 13).

The record demonstrates that J.L.'s overall intransigence forced the court to break J.L.'s pattern of evading in-home services by temporarily removing him from the home. Although the court did not formally recite the words "clear necessity" at the hearing, the court applied the proper standard. Likewise, the court's occasional use of terms like "best interests" or "welfare" is not dispositive of whether the court used an incorrect standard, where those terms are undoubtedly part of the overall analysis under the Juvenile Act. *See* 42 Pa.C.S.A. § 6301. Nothing in this record diminishes the court's primary focus on the clear necessity for the temporary removal of J.L., as reconciled with the purpose of preserving family unity, or calls the court's decision into question. Accordingly, we affirm on the basis of the trial court's opinion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/23/19

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

JUVENILE COURT

In the Interest of J.L.        :       No. CP-46-DP-0000278-2018

## OPINION

DEMCHICK-ALLOY, J.                JANUARY 30, 2019

J.L. is a sixteen-year-old who is currently repeating the ninth grade because of his long history of truancy which, until now, had been treated outside of the juvenile court by the least restrictive alternative measures available. By order filed December 11, 2018, the undersigned judge placed him in a residential program to alleviate his well- entrenched truancy. A month later, on January 8, 2019, the undersigned released J.L. back to the custody of his parents, after which J.L.'s lawyer filed the instant appeal.

## I.    Claims of Error Raised on Appeal

The appellant's statement of errors complained of on appeal mixes allegations of error with arguments in support of those allegations, hence readers must exercise special care to distinguish one from the other. The undersigned discerns the following claims of error, quoting appellant's statement verbatim.

1.      The trial court did not make the requisite finding that the minor's removal from his parental home was clearly necessary or that available alternative services would not

enable the minor to remain with his mother and father.[1]

2. The evidentiary record is insufficient to support a finding that the minor's removal from his home was in his best interest, much less clearly necessary and the agency had not pursued available alternative services that could enable the child to remain with the mother and father.[2]

3. The evidentiary record is insufficient to support the trial court's finding that the agency made reasonable efforts to prevent removal from the home.[3]

4. The evidentiary record does not support the court's conclusion that placement into a residential facility was the least restrictive option and that no less restrictive option was available.[4]

5. The child's due process rights under the Pennsylvania and United States constitutions were violated because the agency provided inadequate notice that it would be seeking the child's removal from parental custody at the adjudication hearing.[5]

6. The December 11, 2018 hearing was noticed as an "Adjudication Hearing." In its December 11, 2018 order, the juvenile court scheduled a "Dispositional Hearing" for January 8, 2019. That order fails to comply with the [Pennsylvania R]ules of [J]uvenile [C]ourt [P]rocedure, which require a dispositional hearing to be held within twenty (20) days of removal.[6]

## II.  Facts

This section will first anticipate an issue regarding the use of facts outside the record on behalf of J.L. in this appeal. Next, this section will

---

[1] See "Concise Statement" filed by appellant on January 10, 2019, p. 2, item one.

[2] See *id.* at p. 2, item two.

[3] See *id.* at p. 4, item four.

[4] See *id.* at p. 5, item five.

[5] See *id.* at p. 3, item three.

[6] See *id.* at p. 6, item nine. The undersigned interprets the remainder of appellant's "Concise Statement," including the entirety of items six, seven and eight as argument in support of the first four claims of error, rather than claims of error in themselves.

2

address unique circumstances affecting the level of deference appropriate to the findings of fact made by the undersigned. After addressing those preliminary matters, this section will set forth the findings of fact made by the undersigned.

## A.   The facts of record do not include any expert opinion evidence

The undersigned anticipates that appellate counsel for J.L. will attempt to buttress appellant's arguments with putative expert opinion evidence outside of the record, as counsel did in the motion for reconsideration filed on behalf of J.L. on December 19, 2018. See motion for reconsideration ¶ 41 (citation to testimony of lawyer-witness in federal legislative hearing); *id.* at ¶ 42 (citation to article published in periodical literature); *id.* (quotation from internet web page attributed to "professor of pediatrics"); *id.* at 49 (citation to periodical article written by retired judge); see also *id.* at ¶ 47 (out-of-context quotation from annual report of Montgomery County Office of Children and Youth). J.L.'s lawyer did not produce any of this unauthenticated hearsay information in court.

Information of this nature is inadmissible as evidence unless an expert witnesses testifies that such authorities are reports of a type reasonably relied upon by experts in their fields in forming opinions on the subject. See Pa.R.E. 703. J.L.'s lawyer neither produced expert witness testimony nor asked for a continuance to do so. As a consequence, neither the undersigned nor the appellate court has had the benefit of *voir dire* or cross-examination of an

expert witness as epistemic assurances of the veracity of the putative expert opinion. This problem is not mitigated by the fact that counsel attached copies of two of the cited sources to the motion as exhibits. Our Supreme Court has consistently adhered to the rule that an appellate tribunal, including itself, may not consider expert opinions and studies never received as evidence in the record of the lower court. *Banfield v. Cortes*, 631 Pa. 229, 258 n.14, 110 A.3d 155, 172 n.14 (2015) ("consideration of such evidence by this Court would be improper since this evidence was never made part of the official record."). Therefore, if appellate counsel includes such information in J.L.'s appellate brief, it may not be considered in the disposition of the appeal.

**B.    The findings of fact made by the undersigned are entitled to deference**

Of the claims of error listed above, the second and third challenge the sufficiency of the evidentiary record in regard to legal conclusions, while the fourth states that the record does not support a legal conclusion. These claims ask the appellate court to determine whether the appellee, the Montgomery County Office of Children and Youth (OCY), met its burden of production, not persuasion. Moreover, they ask for a review of the sufficiency of the evidence not regarding truancy or dependency, but regarding the decision to remove J.L. from his home in response to his dependency. See N.T. December 11, 2018, p. 6 ("We do not oppose the adjudication [of dependency] at this time. However, we do oppose placement at this time."). In assessing these claims, the appellate tribunal does not question the credibility of the evidence, but rather

4

accepts the veracity of all competent evidence of record insofar as the trial judge's observations of demeanor may be relevant to credibility. *See generally In the interest of W.M.*, 41 A.3d 618, 622–23 (Pa. Super. Ct. 2012).

At the hearing on December 11, 2018, the solicitor produced a "Statement of Case Facts," and offered it as Exhibit OCY-1.[7] The solicitor also produced Exhibit OCY-2, a record of J.L.'s attendance at his school in the current academic year.[8] His lawyer did not object to either exhibit on the basis of hearsay or lack of personal knowledge of the persons who provided the facts in the exhibits. The solicitor moved the exhibits into evidence without any objection by counsel for J.L., notwithstanding that the OCY case worker and a school official, Steve Duff, were present in court and the solicitor could have produced their testimony if counsel for J.L. had made a contemporaneous challenge to the veracity of the facts in the exhibits. Likewise, at the hearing on January 8, 2019, the solicitor produced a Statement of Case Facts and offered and moved it into evidence as Exhibit OCY-1[9] without any objection of any kind from counsel for J.L. Although J.L. had no legal obligation to produce evidence on his own behalf because OCY bears the burdens of production and persuasion throughout these proceedings, it is legally significant to the

---

[7] Hereinafter this opinion will refer to the document as Statement of Case Facts, December 11, 2018, to distinguish it from the Statement of Case facts moved into evidence at the hearing on January 8, 2011. See *infra* n.10 and text accompanying note.

[8] Hereinafter this opinion will refer to the document as Exhibit OCY-2.

[9] Hereinafter this opinion will refer to the document as Statement of Case Facts, January 8, 2019.

5

determination of the veracity of the averments of fact in Exhibit OCY-1 that the record includes no evidence that challenged them. In the same sense, it is significant that the averments of fact went unchallenged by contemporaneous argument from J.L.'s lawyer.

Additionally, the undersigned observed the demeanors of J.L.'s parents (who agreed with placement, see N.T. December 11, 2018, p. 9) and his OCY case worker, and their reactions indicated agreement with the material facts recited by the solicitor in court. Even J.L.'s demeanor did not indicate disagreement with the statements of facts except for one: whether bullying remained a reason he refused to attend school. *Id.* at 9-10. (The undersigned refrained from deciding whether bullying remains a problem for J.L., pending the production of additional relevant evidence at future hearings. *Id.* at 10.)[10] Notwithstanding that the evidence of record consists of documents rather than the testimony of witnesses, these circumstances warrant deference to the factual findings of the undersigned in this appeal. *See W.M., supra* (appellate court accepts the veracity of all competent evidence of record insofar as the trial judge's observations of demeanor may be relevant to credibility).

## C.    Findings of fact

Turning to the facts of record, J.L. has a long history of truancy, with attendance issues beginning three years ago, when he was in the seventh

---

[10] On December 21, 2018, J.L. met with his OCY case worker and told her that he had been bullied in the seventh grade, but denied having been bullied within the past few years. Statement of Case Facts, January 8, 2019, p. 3.

grade. Order of December 11, 2018, p. 1. Now, in the 2018-2019 academic year, he is sixteen years old but is only in the ninth grade, and is currently enrolled in that grade for the second year in a row. *Id.* In three years, J.L. lost one and one-half years of education due to his truancy while the school district and OCY attempted to treat it outside of dependency proceedings. This was the single most important fact regarding the decision facing the undersigned on December 11th: whether to briefly remove J.L. from his home while developing a diagnosis and treatment for his truancy, or continue with the less-restrictive options that had proved unsuccessful for three years.

The facts of record begin with J.L.'s 2017-2018 academic year, when his school notified OCY that he was habitually truant. Statement of Case Facts, December 11, 2018. He had accumulated twenty-two unexcused absences by April of 2018. *Id.* The OCY case worker did not file a dependency petition at that time, but instead exercised her judgment as to the "least restrictive option" (to use the words of appellant's counsel) and chose to employ the "alternative services" (again, in appellant's words) of the Academy Truancy Diversion Program. *Id.* Even with the deployment of that alternative service in April of 2018, J.L. accumulated a total of 44 unexcused absences for the 2017-2018 academic year. *Id.*

J.L.'s 2018-2019 academic year began on September 4, 2018, yet by the reckoning of the undersigned he accumulated 31 unexcused absences by the end of October. See Exhibit OCY-2, moved into evidence December 11, 2018.

7

Nonetheless, after J.L.'s school notified OCY about his ongoing truancy in October, 2018, the OCY case worker again chose to divert his case to the Academy Truancy Diversion. Statement of Case Facts, December 11, 2018. The OCY case worker did not formally open a case until November 5, 2018, after the Academy case worker reported that J.L. would not respond, except to lock his bedroom door and refuse to open it when the case worker would arrive at his home in the morning to personally support him getting to school. *Id.*; Order of December 11, 2018, p. 1.

On November 14, 2018, the OCY case worker met with J.L. and his parents at their home. *Id.* The case worker gave J.L. goals that she expected him to meet, and although he appeared cooperative, he failed to explain why he refused to attend school. *Id.* The school attendance record shows that J.L. was absent every day from November 14th through November 28th, see Exhibit OCY-2, when the OCY case worker and a Multi-Systemic Therapist met with J.L. and his parents at his home, see Statement of Facts, December 11, 2018. At that time, the case worker notified J.L. and his parents that she had filed a dependency petition and that a hearing on the petition would be held on December 11th. *Id.* Once again, J.L. agreed to attend school. *Id.* Once again, however, he was unable to stand by his intention, even knowing that he would be appearing court shortly. Exhibit OCY-2 shows an unbroken record of 48 unexcused absences from November 29th through December 5, 2018.

On December 6, 2018, the OCY case worker again met with J.L. and his

8

parents in their home to discuss his ongoing truancy, and he proffered the excuse that he overslept and missed the school bus because he is tired in the morning. Statement of Facts, December 11, 2018. His case worker encouraged him to attend school in the few days remaining before the hearing on the dependency petition, but he could not bring himself attend a single day, even as his date in court loomed less than a week away. *Id.*

The undersigned received all of the foregoing facts at the hearing on December 11, 2018 and found them to be clear and convincing. Years of truancy indicated that J.L.'s parents did not know what to do to support his attendance at school. N.T. December 11, 2018, p. 10. Their palpable anxiety, as witnessed by the undersigned, evidenced by their furrowed brows, reinforced that conclusion. *See id.* at 12. J.L. needed immediate intervention because of the amount of schooling he had lost, and intervention by placement was preferable because none of the interventions in the home had worked. *Id.* at 12-13. J.L.'s parents agreed with placement. *Id.* at 9. Although the need for removal from home was obvious to the undersigned and J.L.'s parents, the undersigned believed a short-term program to alleviate J.L.'s well-entrenched truancy would be sufficient. *See id.* at 11 ("I prefer not to do long-term placement for you...."). The recommended Multi-Systemic Therapy, which had just begun, *id.* at 7-8, could be continued while he was in placement, *id.* at 10. The undersigned found the foregoing facts to be clear and convincing evidence that reasonable efforts were made to prevent the need for removing J.L. from

9

his home, and that it would be contrary to J.L.'s welfare to permit him to remain at home. See Order of Adjudication, December 11, 2018, p. 2; *compare* 42 Pa.C.S. § 6351(b)(1)-(5).

On December 19, 2018, J.L.'s lawyer filed a motion for reconsideration of the order of December 11th. While that motion was pending, the staff at Bethany Children's Home gave J.L. a furlough from December 24th through the 26th, and J.L. celebrated Christmas at home with his family. Statement of Case Facts, January 8, 2019, p. 3. On January 4, 2019, the undersigned filed an order scheduling a hearing on the motion for reconsideration simultaneously with the dispositional hearing on January 8th. At the hearing, OCY, J.L.'s parents and J.L. agreed to an order returning him to the custody of his parents. N.T. January 8, 2019, pp. 4, 6, 17-18. The undersigned filed a written order to that effect at the conclusion of the hearing. Prior to that, J.L. spoke in court, and said, "I just want to say, Your Honor, that I definitely learned my lesson from going to Bethany for the thirty days, and I will make an effort going to school and doing what I need to do to make it right." *Id.* at 13.

In view of the agreed order returning J.L. home, the undersigned asked counsel for J.L. if she would withdraw her motion for reconsideration of the order of December 11th. *Id.* at 19. She responded, "It's our position that it's moot." *Id.* Notwithstanding that she understood her motion for reconsideration to be moot, she stated that she would take the unusual step of filing an appeal from the December 11th order. *Id.*; *see also id.* at 20-21. Two

10

days later, counsel for J.L. filed the notice of appeal.

### III. Discussion

**A. The evidence of record justified the decision to remove J.L. from his home**

All of the first four claims of error pertain to the same basic issue:
whether the facts of record provide legal justification for the decision to remove
J.L. from his home.[11] J.L.'s lawyer conceded that the evidence of record was
clear and convincing proof of dependency based on his habitual truancy. *See*
N.T. December 11, 2018, p. 6. ("We do not oppose the adjudication [of
dependency] at this time."). After a proper determination that a child is
dependent, the judge of the juvenile court may order him removed from the
family home only if the evidence demonstrates a clear necessity for removal. *In
the Interest of A.L.*, 779 A.2d 1172, 1175 (Pa. Super. Ct. 2001). The benefits of
removing the child from his parents' custody must be reconciled with the
"paramount purpose" of preserving family unity. *Id.* This section will explain
why the undisputed facts of record indicate that the brief removal of J.L. from
his parents' custody was clearly necessary and easily reconciled with the
normal preference for family unity.

Removal was necessary because of the confluence of two circumstances.
First, nearly three years' experience supported the conclusion that J.L. was
unable to participate in, and benefit from, the less-restrictive alternative
services that were tried first. Second, at age sixteen, he had lost one and one-

---

[11] Concise Statement, p. 1, items one and two; p. 4 item four; and p. 5, item five.

11

half years of his education, thus creating an immediate need for effective action. Regarding the first circumstance, J.L. was diverted from dependency proceedings to alternative services in the 2017-2018 academic year, and again from September to November of the current academic year, but he was still unable to bring himself to attend school, and his truancy continued unabated. He locked his bedroom door and refused to communicate with the Academy Truancy Division case worker. When his OCY case worker met with him at home and tried to get him to tell her why he refused to go to school, he made a sad excuse that he constantly overslept and missed the school bus. These facts were clear and convincing evidence that reasonable efforts were made to prevent removal of J.L. from his home, and that it would have been contrary to his welfare to permit him to remain at home. *See* 42 Pa.C.S. § 6351(b) (establishing mandatory pre-placement findings by juvenile court judge).

In this case, the undersigned stated on the record that the plan was never long-term placement, N.T. December 11, 2018, p. 11, so reunification of the family after a brief placement was never in doubt. J.L.'s parents agreed at the December 11th hearing that he should be removed from their home. *Id.* at 9. Their demeanor was not one of animosity toward their son, but anxiety for his wellbeing. They appeared to be worried sick over his truancy. *Id.* at 12. Under these circumstances, a short-term removal of J.L. from his family's home was easily reconciled with the normal preference for preserving family unity.

12

Judges of the juvenile courts are given broad discretion in meeting the goal of fashioning a disposition best suited to the protection and physical, mental, and moral welfare of dependent children. *In the Interest of S.M.*, 614 A.2d 312, 315 (Pa. Super. Ct. 1992). The foregoing discussion suggests that the order appealed from cannot be characterized as an abuse of discretion. Empirical confirmation of this conclusion comes from J.L.'s own statement in court, that he had learned from his thirty-day placement and was committed to doing his part to attend school. N.T. January 8, 2019, p. 13.

In light of the foregoing standard of review, the arguments raised by counsel for J.L. are unpersuasive. The fact that the one-month placement coincided with the winter vacation at J.L.'s school district has little significance because the purpose of immediate placement was not just to enforce attendance when school was in session, but to place him, without further delay, in an environment where he could not lock the door to his bedroom or otherwise hide from therapeutic outreach, such as the Multi Systemic Therapy. The necessity and efficacy of placing him in a therapeutic environment is supported by his statement in court that he was motivated to begin confronting the problems underlying his truancy.

The fact that Multi-Systemic Therapy had not begun in earnest when J.L. was removed from his home[12] is likewise of little significance. Multi-Systemic Therapy could be, and was, conducted while J.L. was in placement, and it was

---

[12] See Concise Statement, p. 4, item four.

extremely unlikely to have been effectuated in the absence of placement. The young man who locked his door and refused to speak with case workers, who at best offered oversleeping as an excuse instead of being open about his aversion to school, was one who had very little chance of succeeding in any form of therapy. In contrast, the young man who said, "I will make an effort going to school and doing what I need to" is one who may be ready to do the difficult, earnest work required in order for therapy to be effective.

The alleged insufficiency of the educational determination and family finding efforts in the Case Statement of Facts of December 11th[13] are also of little significance. The Juvenile Act does not require that the juvenile court judge make such findings when making orders of adjudication or disposition in dependency proceedings. See 42 Pa.C.S. §§ 6341(a), (c), (d), 6351(b). The order of adjudication of December 11, 2018 complied with the requirement of Pa.R.J.C.P. 1149(A) regarding family finding. Given the purpose of family finding, see 62 P.S. § 1301, and the fact that the parents' agreement to placement indicated that they and J.L. were not in need of extended family support, it was sufficient that the order of adjudication directed OCY to continue to engage in family finding. See Order of December 11, 2018, p. 3; *compare* 62 P.S. § 1302.2(a)(1) (stating grounds for discontinuing family finding in circumstances similar to these). Regarding the educational concerns, the order placed J.L.'s individualized educational needs in the hands of the

---

[13] See Concise Statement, p. 5, item six and p. 6, item eight.

14

Montgomery County Intermediate Unit and directed further assessment of his needs. *Id.*; see also N.T. January 8, 2019, pp. 12-13 (counsel criticizing results of psychological evaluation conducted while in placement).

Appellant's most complicated argument is also the least-persuasive: that removal was premature and without an evidentiary foundation because J.L. has an Individualized Educational Program (IEP).[14] Counsel for J.L. conceded on December 11th that the evidence of record was sufficient to support the adjudication of dependency for truancy, even though it included no evidence of the disability or disabilities that qualified J.L. for an IEP. That concession reflects the applicable legal rule: the agency that brings a truancy petition bears the burden of producing clear and convincing evidence that the student's absence from school was without legal justification; and testimony and attendance records establishing that the school received no excuse from the student or parents for the absences, or that the proffered excuse is invalid, are sufficient to raise an inference that the absences are unjustified. *In the Interest of C.M.T.*, 861 A.2d 348, 354 (Pa. Super. Ct. 2004). After that, the parent or minor child may produce evidence relevant to rebutting the inference. *Id.* Counsel for J.L. provides no reason why the same evidentiary process should not also apply to the dispute between the parties as to the remedy for the truancy, yet that is the hidden premise of counsel's argument regarding IEP-related evidence.

---

[14] See Concise Statement, p. 4, item four and p. 5, item six; see also pp. 3-4, item three (referring to need for time to analyze records and consult subject-matter experts).

15

The actions, or inactions, of counsel for J.L. at the hearing on December 11th suggest that this argument was developed in hindsight. At the hearing, J.L.'s lawyer never stated that she lacked adequate information about the IEP or J.L.'s disabilities. See N.T. December 11, 2018, pp. 7, 8. Neither did counsel ask for a continuance to obtain his educational records. *Id.*; *see* 42 Pa.C.S. § 6341(e) (court may continue hearing on motion of a party to receive evidence relevant to disposition). After the adjudication hearing, J.L.'s lawyer declined to speak to Steve Duff, the school official who had a copy of the IEP on his person and was prepared to discuss it. *See* N.T. January 8, 2019, pp. 14-15. In the motion for reconsideration, and at the subsequent hearing on January 8th, counsel for J.L. speculated that the school district was not meeting his unique educational needs, and the undersigned had to urge J.L.'s lawyer to take the obvious step of meeting with Mr. Duff after the hearing and obtaining a copy of the IEP from him. Motion for Reconsideration, ¶ 39; N.T. January 8, 2019, pp. 13-16.

J.L.'s lawyer could have gained some of his IEP-related information simply by interviewing him and his parents before the hearing. J.L.'s parents were present in court on December 11th, and they would have known why their son had an IEP, whether it adequately addressed his individual needs, and whether his school was complying with its terms. One might infer that J.L.'s educational disabilities did not militate against removal when his father stated at the hearing that he agreed with the decision to remove J.L. from the

16

family home. Consequently, it is significant that on December 11th his lawyer did not ask for a continuance to obtain his educational records and did not speak to Steve Duff about them after the hearing.

## B.  J.L. and his lawyer received adequate advance notice that OCY sought to remove him from his home

J.L. contends that his "due process rights under the Pennsylvania and United States constitutions were violated because [OCY] provided inadequate notice that it would be seeking the child's removal from paternal custody at the adjudication hearing." This section will address the arguments made in support of this claim and show that J.L. and his lawyer had adequate notice of OCY's desire to remove him from his family's home.

J.L. argues that the dependency petition filed on November 21, 2018 requested that J.L. "be adjudicated dependent and permitted to remain in the home with Mother and Father." Petition, p. 5. The petitioner was not, however, required to plead the remedy sought. See Pa.R.J.C.P. 1330.B. (prescribing contents of dependency petition). Moreover, counsel for J.L. would have observed that several of the paragraphs in the petition were made in anticipation of the possibility that the facts might warrant an order removing him from the home. See petition, pp. 3-4. Additionally, as J.L.'s lawyer noted in the Concise Statement, on the Friday before the hearing on Tuesday, December 11th, she received a copy of OCY's proposed Statement of Case Facts recommending that the undersigned grant OCY legal and physical custody of J.L. See Concise Statement, pp. 3-4. Nonetheless, counsel did not ask for a

17

continuance. The official notice of the December 11th hearing described it as an adjudicatory hearing, not a dispositional hearing, but counsel for J.L. would have known that the judge of the juvenile court may proceed immediately to a dispositional hearing from an adjudicatory hearing. 42 Pa.C.S. § 6341(c).

When the solicitor for OCY asked for an order placing J.L. in a shelter at the beginning of the hearing of December 11, 2018, J.L.'s lawyer had sufficient advance notice to reply, "We do not oppose the adjudication [of dependency] at this time. However, we do oppose placement at this time." N.T. December 11, 2018, p. 6. J.L.'s lawyer did not state that she lacked adequate notice to prepare an effective response to the solicitor's request for an order placing J.L. in shelter care. *Id.; see also id.* at 14-15. Instead, she made a cogent argument that J.L.'s parents were covered by a good health care plan that enabled them to obtain psychological and psychiatric evaluations, and that the undersigned should allow him to remain at home receiving Multi-Systemic Therapy until such assessments had been completed. *Id.* at 7-8.

Counsel for J.L. also argues that OCY failed to provide her with records, such as educational records, "that would have informed a reasonable analysis regarding the needs of the child and any possible...defenses to removal from the home." In section III.A., *supra*, the undersigned noted that counsel for J.L. failed to take advantage of opportunities to obtain educational records and facts from Steve Duff, J.L.'s parents and J.L. himself. She could have asked for a continuance while she pursued discovery, see 42 Pa.C.S. § 6341(e) and

18

Pa.R.J.C.P. 1340, but she declined to do so.

Counsel complains that even if she had been able to obtain records, she would also have required time to analyze them, but this complaint returns the focus to the heart of this matter. As discussed in section III.A., *supra*, J.L.'s loss of one and one-half years of his education over the past three years created an immediate need for placement because less-restrictive alternative means had failed. Immediate, short-term removal from the home was not just in his best interests, it was clearly necessary for his welfare. That was not only the opinion of the undersigned but also J.L.'s parents. J.L.'s need for time to obtain and analyze records did not outweigh the need for a prompt hearing and, as the evidence showed, prompt placement.

## C. The undersigned did not err by scheduling the dispositional hearing more than twenty days after the adjudication hearing

If a juvenile judge removes a child from the home after adjudicating him dependent, the Juvenile Act, 42 Pa.C.S. § 6304(c) and the Pennsylvania Rules of Juvenile Court Procedure, Pa.R.J.C.P. 1510, require a dispositional hearing to be held within twenty days. In this case, that would have been no later than December 31, 2018. Counsel for J.L. complains that the undersigned erred by "fail[ing] to comply with the [Pennsylvania R]ules of [J]uvenile [C]ourt [P]rocedure, which require a dispositional hearing to be held within twenty (20) days of removal."

At the conclusion of the adjudication hearing on December 11, 2018, counsel for OCY proposed holding the dispositional hearing on December 27,

19

2018. N.T. December 11, 2018, p. 15. The undersigned responded that she would not be on duty on that date, and instead proposed to hold the dispositional hearing on January 8, 2019. *Id.* Neither the solicitor nor J.L.'s lawyer objected. *Id.* The undersigned interpreted the lack of objection from counsel as an agreement to that date. *See id.* (undersigned stating "All right" after having heard no objection by counsel, and proceedings concluding without objection).

The undersigned believed counsel agreed, or at least acquiesced, to the January 8th date because the alternative would have been to hold the dispositional hearing before a different judge who would not have been familiar with the case. The undersigned inferred that counsel for J.L. preferred to have a judge familiar with the case preside over the dispositional hearing even if that meant holding the hearing approximately twenty-eight days after the adjudication hearing. Counsel has argued in this appeal that she needed more time prior to disposition to obtain and analyze educational and other records relevant to disposition, hence one might also infer that she did not object to the January 8th date because it inured to the benefit of J.L. Given the apparent acquiescence of counsel for J.L. at the time the dispositional hearing was scheduled, the undersigned suggests that it was not an abuse of discretion to schedule the dispositional hearing for January 8, 2019.

Although section 6341 of the Juvenile Act requires that the dispositional hearing take place no more than twenty days after entry of an adjudication

20

order removing a dependent child from his home, the same section also states, "The court's failure to comply the time limitations stated in this section shall not be grounds for discharging the child or dismissing the proceeding." 42 Pa.C.S. § 6341(a).[15] The Supreme Court of Pennsylvania has not adopted a rule of court that suspends this statutory text in whole or in part. Neither has it been suspended in whole or part by decisional law of a Pennsylvania appellate court. Therefore, it operates as a limitation on the actions of judges when adjudicating claims such as the one brought on behalf of J.L. Even if J.L. remained in placement at this time, the appellate court could not discharge him from placement or dismiss the dependency proceedings *solely* as a remedy for the alleged violation of his procedural right to a dispositional hearing within twenty days of adjudication. The only remedy for that, if it could be called one, would be some sort of advisory opinion as to what the proper course of action would have been. Such an opinion would be justified only by an error of law or abuse of discretion, not a mere difference of opinion as to the better alternative. "As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality,

---

[15] The quoted text in subsection 6341(a) refers to plural time limitations, not a single time limitation. Therefore, the text does not refer merely to the seven-day time limitation established by subsection 6341(a) itself, but all four of the time limitations established by section 6341. *See* 42 Pa.C.S. § 6341(b) (establishing two additional time limitations for delinquency proceedings); 42 Pa.C.S. § 6341(c) (establishing time limitation at issue).

21

prejudice, bias, or ill-will." *In the Interest of C.M.C.*, 140 A.3d 699, 704 (Pa. Super. Ct. 2016) (citations omitted).

## CONCLUSION

In view of the foregoing opinion, the undersigned respectfully suggests that the claims of error on appeal lack merit and the matter should be remanded to this court for further review.

BY THE COURT,

_____
Wendy Demchick-Alloy, Judge

**Copy of above sent on** /1/30/19 **to:**
Lee Awbrey, A.P.D. and Jessica Schidlow, A.P.D; Office of the Public Defender; by inter-office mail
Eric Cox, Assistant County Solicitor; by inter-office mail
Bruce Pancio, Esquire; Walsh Pancio LLC; 2028 N. Broad Street; Lansdale, PA 19446; by first-class mail
Damien Brewster, Esquire; Keenan Ciccito Associates LLP; 376 E. Main Street; Collegeville, PA 19426; by first-class mail

22